**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | |
| 11380 SMITH ROAD, LLC, ) | Case No. 19-10286(TBM) |
| EIN: 46-4766309, ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| ) | |

**11380 EAST SMITH RD INVESTMENTS, LLC'S, MOTION TO DISMISS INVOLUNTARY BANKRUPTCY CASE**

COMES NOW 11380 East Smith RD Investments, LLC ("**Lender**"), the Debtor's sole secured lender, for its Motion to Dismiss Involuntary Bankruptcy Case (the "**Motion**"). In support of the Motion, Lender states as follows:

### Introduction

1. This involuntary bankruptcy case is yet another episode of "bad faith" that is associated with this single asset real estate Debtor. As the Court is familiar, the Debtor in this involuntary bankruptcy case is already a debtor in this Court but in its own voluntary Chapter 11 case (the "**Chapter 11 Case**"). (Case No. 18-10965(TBM)).[1] The Court may recall, from Lender's previously filed stay relief motion in the Chapter 11 Case, that the Debtor sought bankruptcy protection on the eve of Lender's state law public trustee's sale nearly 4 months following the date Lender's note had matured. It was later discovered in the Chapter 11 Case that the Debtor actually only had 2 unsecured creditors: one who asserted claims against the Debtor in the United States District Court regarding certain insurance policies, and the other who purportedly loaned the Debtor $1,200,000—Mr. Tim Henzel ("**Henzel**"). Notwithstanding discovering information which questioned the legitimacy of Henzel's purported "claim" and his friendship with the Debtor's principal Mr. Louis Hard, Lender and Debtor entered into a stipulated agreement that would allow the Debtor to either refinance the Lender's note or sell the Debtor's building prior to January 1, 2019 (the "**Drop-Dead Date**"). If the Debtor were unable to get a deal done prior to the Drop-Dead Date, then Lender would be granted relief from the automatic stay. The terms of the stipulated agreement were subsequently incorporated into the Debtor's confirmed Chapter 11 plan.

2. The Drop-Dead Date passed and the Lender—pursuant to the terms of its stipulated agreement with the Debtor—obtained relief from the automatic stay to recommence its public trustee's sale. However, on the morning of the second public trustee's sale on January 16, 2019, Henzel—now purportedly acting through an entity known as Mid America Plastic Systems ("**MAPS**")—commenced this involuntary bankruptcy case alleging a claim in the amount of

---

[1] All citations to the record in the Chapter 11 Case will be styled as "Chp. 11 Docket No. ___".

$1,200,000 thereby staying Lender's second attempt to legally liquidate its collateral at a public trustee's sale. Further perplexing to Lender, the same attorney that represented Mr. Hard personally during the negotiation of the stipulated agreement with Lender is the attorney who filed this involuntary bankruptcy case on behalf of MAPS. Regardless, Henzel has now commenced this duplicative and unnecessary action to try and resolve his claim against the Debtor notwithstanding the fact that he had every opportunity to participate in the proposed treatment of his claim during the Chapter 11 Case, but failed to do so.

3. As detailed in the Chapter 11 Case, Lender asserted that the Debtor commenced such case in bad faith under the relevant *Little Creek* factors. After reviewing the relevant facts discovered in the Chapter 11 Case, Lender asserts that this case was also filed in bad faith by Henzel/MAPS and was likely orchestrated by the Debtor or its principal, Mr. Hard. Accordingly, Lender seeks dismissal of this involuntary case on two separate grounds: (i) the involuntary case was filed in bad faith; and (ii) Henzel/MAPS' claim should be recharacterized under applicable Tenth Circuit law as equity thereby eliminating his status as a petitioning creditor under Section 303 of the Bankruptcy Code.

## Background

A.   **The Debtor's Loan Obligations.**[2]

4. On October 25, 2016, the Debtor made, executed and delivered its promissory note to Lender in the principal amount of $3,000,000 (the "**Note**") as required under that certain loan agreement between Debtor and Lender. The obligations due and owing under the Note are secured by a first-position security interest in the real property commonly known as 11380 East Smith Road, Aurora, Colorado 80010 (the "**Property**"). Lender perfected its lien against the Property, on October 26, 2016, when it recorded a copy of the DOT with the Clerk and Recorder of Adams County, Colorado, as Reception No. 2016000091839.

5. The Debtor's authorized representative is Mr. Louis Hard ("**Mr. Hard**") who also personally guaranteed all amounts due and owing under the Note. (Chp. 11 Docket No. 70 at ¶ 11).

6. Debtor failed to make the regular payments due under the Note for the months of July 2017, August 2017, September 2017 and October 2017. (*Id*. at ¶ 12).

7. On October 25, 2017, the Note matured by its terms, and the Debtor failed to repay the obligations due and owing thereunder according to the terms thereof. (*Id*. at ¶ 13).

8. Prior to the commencement of the Chapter 11 Case (defined below), Lender had properly noticed a Sale of the Property that was set for February 14, 2018 at 10:00 a.m. (the

---

[2] A thorough description of the Debtor's loan obligations and collateral package with the Lender, along with copies of the relevant loan documents, is set forth in paragraphs 5 through 14 of Lender's *Motion: (I) for Relief From the Automatic Stay Pursuant to Section 362(d)(1) of the Bankruptcy; and (II) to Dismiss This Chapter 11 Bankruptcy Case for Bad Faith Pursuant to Section 1112(b) of the Bankruptcy Code* (Chp. 11 Docket No. 70) (the "**Stay Relief/Dismissal Motion**").

2

"**Trustee's Sale**"). (*Id*. at ¶ 14). A true and correct copy of the notice of Trustee's Sale is attached hereto as Exhibit A.

**B.    Background Regarding the Debtor's Currently Pending Chapter 11 Bankruptcy Case.**

9.    On February 13, 2018—*the eve of the Trustee's Sale*—the Debtor initiated its Chapter 11 Case when it filed its voluntary petition for relief. (Chp. 11 Docket No. 1).

10.    The Debtor filed the Chapter 11 Case as a single asset real estate entity as such term is defined under Section 101(51B) of the Bankruptcy Code, and identified the Property as the Debtor's only meaningful asset. (*Id*. at p. 2 and 15).[3]

11.    The Debtor's Amended Schedule F identified only three unsecured creditors: (i) Henzel in the amount of $1,200,000 for a purported loan, (ii) Owners Insurance Company in an "unknown" amount that is disputed, contingent and unliquidated, and (iii) Xcel Energy in the amount of $32,000.[4] (Chp. 11 Docket No. 37).

12.    The Debtor is owned entirely by Mr. Hard. (Chp. 11 Docket No. 5).

13.    On April 10, 2018, the Lender filed its Stay Relief/Dismissal Motion. (Chp. 11 Docket No. 70).

14.    In the Stay Relief/Dismissal Motion, Lender argued that it should be granted relief from the automatic stay, or that the entire Chapter 11 Case be dismissed, on the basis that the filing of the Chapter 11 Case satisfied the relevant *Little Creek* factors including: (i) the Debtor's only asset is the Property which is encumbered by Lender's lien; (ii) the Debtor has only 1 employee;[5] (iii) the Debtor only had 2 other unsecured creditors and that Henzel's purported claim appeared to be questionable;[6] (iv) the Debtor commenced the Chapter 11 Case on the eve of the Trustee's Sale; and (v) the Debtor had no business to reorganize. (*See id*.).

---

[3] The Debtor's Schedule B in the Chapter 11 Case identified only three assets: (i) intercompany loans between the Debtor and two entities which Mr. Hard was the sole owner of in the amount of $4,365,682.00 which the Debtor acknowledged are likely uncollectible; (ii) A/R in the amount of $135,752.22; and (iii) a legal claim against an insurance company relating to a hail damage claim that the Debtor values at $2,500,000. (Chp. 11 Docket No. 1 at p. 13-15).

[4] At the first meeting of creditors, the Debtor testified that Xcel's debt had been paid in full post-petition. (Chp. 11 Docket No. 70 at ¶ 25(x).

[5] Upon testifying under oath at the Deposition, the Debtor admitted that it actually has no employees.

[6] As set forth in the Stay Relief/Dismissal Motion, Lender questioned the validity and legitimacy of Henzel's claim due to the amount alleged, the personal relationship between Mr. Hard and Henzel, and Henzel's indifference with respect to enforcing his claim. (*See* Chp. 11 Docket No. 70, p. 9 at fn. 2) ("Henzel's claim raises additional questions as to its legitimacy. Apparently, Henzel is someone who the Debtor has known over the years who happened to loan the Debtor approximately $1.2 million in order to improve property formerly owned by the Debtor. However, Henzel never took a security interest in the property that his loan proceeds were used to improve. Given the length of

15. On May 1, 2018, the Lender deposed the Debtor's representative, Mr. Hard, regarding numerous topics in advance of a trial on the Stay Relief/Dismissal Motion including the particular aspects of Henzel's purported claim in the amount of $1,200,000 (the "**Deposition**"). A true and correct copy of the transcript from the Deposition is attached hereto as Exhibit B.

16. On May 15, 2018, the Lender and Debtor entered into that certain Stipulated Agreement regarding, *inter alia*, the treatment of Lender's claim during the Chapter 11 Case, and Lender's rights and remedies upon the occurrence or non-occurrence of certain events in the Chapter 11 Case (Chp. 11 Docket No. 98-2) (the "**Agreement**").

17. The Agreement allowed the Debtor to either sell the Property or refinance Lender's Note no later than January 1, 2019, *i.e.*, the Drop-Dead Date. (*Id.* at ¶ 2). If the Drop-Dead date occurred, Lender was then authorized to, *inter alia*, obtain agreed relief from the automatic stay in order to "exercise all remedies under applicable non-bankruptcy law against the Property." (*Id.* at ¶ 4). The Debtor agreed that if the Chapter 11 Case were ever dismissed that it would not re-file a subsequent bankruptcy case under any Chapter of the Bankruptcy Code. (*Id.* at ¶ 5(e)).[7]

18. Mr. Hard, in his individual capacity and as guarantor of the Note, was also a party to the Agreement and was represented by Mr. Barber during the course of negotiating the Agreement. (*Id.* at p. 11 and 15).

19. The Motion to approve the Agreement was served on the Debtors' estate including Henzel. (Chp. 11 Docket No. 107-1). Henzel did not object to the approval of the Agreement.

20. On June 29, 2018, the Court entered its Order Approving the Agreement in full. (Chp. 11 Docket No. 110).

21. On September 20, 2018, the Debtor filed its: (i) Second Amended Plan of Reorganization (Chp. 11 Docket No. 123) (the "**2nd Amended Plan**"); and (ii) Second Amended Disclosure Statement (Chp. 11 Docket No. 124) (the "**2nd Amended Disclosure Statement**").

22. The 2nd Amended Plan states that "[t]he terms and conditions of the [] Agreement are incorporated into and made a part of this Plan. A copy of the [] Agreement is attached hereto as Exhibit '1'." (Chp. 11 Docket No. 123, p. 8 at § 4.2). In fact, as proposed under the 2nd Amended Plan, the Agreement was attached as an exhibit.[8] (Chp. 11 Docket No. 123-1).

---

relationship between the Debtor and Henzel along with the failure to take any collateral to secure a $1.2 million loan, Lender questions whether Henzel's claim is truly legitimate and at arm's length.").

[7] The terms of the Agreement explicitly survive any other case pending under Title 11 of the United States Code. (Chp. 11 Docket No. 98-2 at ¶ 13). Accordingly, Lender has already filed a Motion for Entry of Order Pursuant to Court Approved Stipulated Agreement in this involuntary case. (Case No. 19-10286 at Docket No. 6).

[8] Furthermore, prior to confirming the 2nd Amended Plan, the Court entered an order approving a stipulation between the Parties which provided that "[f]or the avoidance of doubt, to the extent any provision of the Plan conflicts with the Stipulated Agreement, then the terms of the Stipulated Agreement shall control in all circumstances." (*See* Chp. 11 Docket Nos. 132, 132-1 at ¶ 2, and 137).

23. On September 27, 2018, the Debtor served both the 2nd Amended Plan and 2nd Amended Disclosure Statement upon Henzel. (Chp. 11 Docket No. 130). Henzel did not object to the terms of the 2nd Amended Plan or 2nd Amended Disclosure Statement.

24. On October 31, 2018, the 2nd Amended Plan, with the terms of the Agreement expressly incorporated therein, was confirmed (the "**Confirmation Order**"). (Chp. 11 Docket No. 138).

**C.    Background Regarding Events Subsequent to the Drop-Dead Date.**

25. The Debtor was unable to sell the Property or refinance Lender's Note prior to the occurrence of the Drop-Dead Date. Accordingly, on January 2, 2019, Lender filed its *Notice of Occurrence of Drop-Dead Date and Agreed Relief From Automatic Stay Pursuant to Section 4(b) of the Court Approved Stipulated Agreement* (Chp. 11 Docket No. 159) (the "**Stay Relief Notice**").

26. In furtherance of the Stay Relief Notice, the Court entered a *Comfort Order Granting Relief From Automatic Stay Pursuant to Section 4(b) of Court Approved Stipulated Agreement* (Chp. 11 Docket No. 160) (the "**Comfort Order**").

27. Upon entry of the Comfort Order, Lender proceeded to re-commence its Trustee's Sale with the Adams County Public Trustee for January 16, 2019 at 10:00 a.m. (the "**Second Trustee's Sale**").

28. On January 16, 2019, approximately 33 minutes before the Second Trustee's Sale was scheduled to begin, Lender received notice from the Adams County Public Trustee that this involuntary bankruptcy case had been filed earlier that morning thereby staying the Second Trustee's Sale. Attached as Exhibit C is a true and correct copy of the notice of the commencement of this involuntary case.

**D.    Background Regarding This Involuntary Bankruptcy Case.**

29. The petition filed in this involuntary bankruptcy case (the "**Involuntary Case**") does not contain much information other than: (i) the only petitioning creditor is Mid America Plastic Systems ("**MAPS**"); (ii) the nature of MAPS' claim is for "money loaned"; (iii) the amount of MAPS' claim is for $1,200,000; (iv) Henzel signed the involuntary petition as MAPS' representative; and (v) MAPS seeks relief under Chapter 7 of the Bankruptcy Code. (Docket No. 2).

30. Mr. Barber, who represented Mr. Hard in negotiating the terms of the Agreement as a guarantor of Lender's Note, signed and filed the involuntary petition as counsel for MAPS. (*Id*.).

31. The Debtor appears to be represented by different counsel in this Involuntary Case than in the Chapter 11 Case. (Docket No. 4).

5

**E.     Background Regarding Henzel's Purported Claim.**

32.     Henzel's purported claim in the Chapter 11 Case, in the amount of $1,200,000 for a "loan", appears to be the exact same claim now asserted by MAPS in this Involuntary Case, also in the amount of $1,200,000 for "money loaned".

33.     In the Chapter 11 Case, the Debtor scheduled Henzel's address at 1510 Jade Road, Columbia, Missouri 65201. And in this Involuntary Case, MAPS identifies its address as 1510 Jade Road, Columbia, Missouri.

34.     Prior to the Deposition, the Debtor produced the most "current" agreement evidencing Henzel's purported claim of $1,200,000 (the "**Henzel Agreement**"). A true and correct copy of the Henzel Agreement is attached hereto as Exhibit D.

35.     The Debtor testified to, *inter alia*, the following facts regarding Henzel, the Henzel Agreement and the Debtor's relationship with Henzel:

   i.   Mr. Hard has known Henzel for between 10 and 20 years. (44:19-45:7).

   ii.  Mr. Hard and Henzel are friends. (45:8-11).

   iii. Mr. Hard and Henzel were former business partners in 3555 Moline, LLC. (45:12-16).

   iv.  As of the date of the Deposition, the Debtor's only creditors were Xcel, Henzel and Owners Insurance Agency. (43:24-44:13).

   v.   As of the petition date in the Chapter 11 Case, the Debtor purportedly owes Henzel $1,200,000. (45:17-19).

   vi.  The most current agreement with Henzel is the Henzel Agreement. (46:24-47:2).

   vii. There may, or may not, be three or four promissory notes evidencing Henzel's claim for $1,200,000. (47:15-20).

   viii. Whenever the Debtor needed money from Henzel, all it had to do was call Henzel. There was no formal procedure to receive money. (48:1-9).

   ix.  As of the date of the Deposition, Henzel's claim was about five years old. (48:18-19).

   x.   As of the date of the Deposition, $785,000 of Henzel's $1,200,000 claim is potentially between five and six years old (the "**Original Debt**"). (49:21-23).

   xi.  The Debtor was uncertain of whether the Original Debt with Henzel: (i) had a maturity date, (ii) accrued interest, (iii) the Debtor was ever required to make

      scheduled payments to Henzel; and (iv) what amounts were, in fact, actually paid to Henzel. (50:7-25).

xii. The Debtor never adopted a formal resolution authorizing the Original Debt or the additional $415,000 (the "**New Debt**") borrowed under the Henzel Agreement. (51:8-13; 60:12-19).

xiii. The funds from the Original Debt were used purchase to equipment and capital expenditures including for Mr. Hard's wholly owned entity Hi-Tech Recyling. (51:17-21; 52:13-25).

xiv. There were no restrictions placed upon the Debtor as to how it desired to spend the $1,200,000 borrowed from Henzel. (53:4-15).

xv. The $1,200,000 was used to pay obligations of not only the Debtor, but obligations of all of Mr. Hard's personally owned entities. (53:16-54:11; 57:18-58:25).

xvi. Upon selling the Debtor's real property located at 3555 Moline Street, Aurora, Colorado (the "**Moline Property**"), for $3,900,000, the Debtor did not use any sale proceeds therefrom to repay Henzel but instead used such proceeds to pay debts of Mr. Hard's other wholly owned entities. (22:17-23; 54:19-55:6).

xvii. The repayment of Henzel, under the terms of the Henzel Agreement, is wholly contingent upon the Debtor entering into a new lease with Reloni Group, LLC ("**Reloni**"), which such lease was never entered into and is ineffective. (66:19-24; 80:13-16).

xviii. The Debtor admits that because the Reloni lease never became effective, Henzel's claim fails. (133:10-17).

xix. The repayment of Henzel's debt under the Henzel Agreement allowed Henzel to be paid more than $1,200,000 of debt he is purportedly owed despite the fact there is no interest rate contained in the Henzel Agreement. (75:22-76:23).

xx. At the time the Debtor entered into the Henzel Agreement, the Debtor was immediately in default thereof. (78:10-13).

xxi. Despite purportedly lending the Debtor $1,200,000, and the Henzel Agreement granting Henzel a security interest in all monies received from Reloni, Henzel never perfected a security interest to secure the purported loan of $1,200,000. (47:21-22; 78:14-17).

xxii. So long as the Debtor owns the Property, then there is no fixed maturity date to repay the $1,200,000 to Henzel under the Henzel Agreement. (78:18-79:1).

7

xxiii. Henzel has never taken any legal action against either the Debtor or Mr. Hard (as guarantor) to recover any portion of the $1,200,000 he purportedly loaned to the Debtor. (79:8-13; 80:21-23).

xxiv. The Henzel Agreement contains no default provisions. (79:14-19).

xxv. The Henzel Agreement contains no remedies provisions. (80:6-8).

xxvi. Henzel could not accelerate the obligations under the Henzel Agreement on account of any defaults by the Debtor. (80:17-20).

xxvii. Prior to entering into the Henzel Agreement and obtaining the New Debt, the Debtor did not look to borrow funds from any other person to find better terms. (81:8-18).

xxviii. In connection with providing a personal financial statement to a prospective lender to refinance the Note, Mr. Hard did not list in his personal liabilities his obligations under the Henzel Agreement despite guaranteeing the obligations thereunder. (245:1-249:12).

xxix. Obtaining equity from the sale of the Property is part of Mr. Hard's overall personal retirement strategy. (190:19-25).

xxx. Protecting the equity in the Property and enhancing Mr. Hard's personal retirement was one of the reasons the Debtor commenced the Chapter 11 Case. (191:12-21).

xxxi. Mr. Hard's wholly owned plastics company had dealings with Henzel for many years. (44:14-18).

36. Given that: (i) the claim amounts of Henzel and MAPS are identical, (ii) the addresses of Henzel and MAPS are identical, (iii) Mr. Hard testified that the Debtor has no other claims other than Xcel, Owners Insurance Agency, and Henzel, (iv) the Debtor's schedules and 2nd Amended Plan filed under oath in the Chapter 11 Case identify only Henzel—not MAPS, and (v) Mr. Hard's relationship with Henzel spans numerous years as friends, business partners, and a purchaser of equipment, the claim of Henzel and MAPS is the same claimant.

## **Relief Requested**

37. Lender requests that this Court dismiss this involuntary bankruptcy case on two separate bases: (i) the case was filed in bad faith as it was orchestrated by the Debtor and Henzel/MAPS, and was filed for the purpose of interfering with Lender's Trustee's Sale; and (ii) under applicable Tenth Circuit law, Henzel's claim should be recharacterized from debt to equity thereby eliminating his status as a petitioning creditor under Section 303 of the Bankruptcy Code.

**Argument**

A. **The Involuntary Bankruptcy Case was Filed in Bad Faith as it was Orchestrated by the Debtor and Henzel/MAPS to Prevent Lender's Foreclosure Sale for a Second Time.**

38. As set forth in the Stay Relief/Dismissal Motion, Lender asserted that the Chapter 11 Case should have been dismissed for bad faith under the applicable *Little Creek* factors thereby constituting "cause" under Section 1112(b) of the Bankruptcy Code. (Chp. 11 Docket No. 70 at ¶¶ 33-36). Lender submits that many of the same facts and arguments supporting dismissal of the Chapter 11 Case for bad faith also support dismissal of this Involuntary Case. *In re Springs Hosp., Inc.*, 2006 Bankr. LEXIS 1804 at *10 (Bankr. D. Colo. Aug. 22, 2006) (dismissing involuntary case for bad faith under Section 1112(b) under substantially the same factors as *Little Creek*).

39. Furthermore, other bankruptcy courts have dismissed involuntary bankruptcy cases for bad faith when they are filed by petitioning creditors with no legitimate purpose or the case was filed by petitioning creditors at the orchestration of the debtor. *See In re Delray Assocs. Ltd. Pshp.*, 212 B.R. 511 (Bankr. D. Md. 1997) (dismissing involuntary petition as it was a serial filing in bad faith which was orchestrated by the single asset real estate debtor in order to prevent a secured creditor from foreclosing its deed of trust); *In re VII Holdings, Co.*, 362 B.R. 663, 666 (Bankr. D. Del. 2007) (analyzing whether non-petitioning creditor can recover damages against a petitioning creditor for an "involuntary petition [that] was filed in bad faith and 'for no other purpose than to improperly frustrate the [foreclosure] efforts" of two secured creditors after stay relief was obtained in an earlier filed bankruptcy case.); *In re Winn*, 49 B.R. 237, 239 (Bankr. M.D. Fla. 1985) ("[W]hether it is voluntary or involuntary, the Court must protect the integrity of its jurisdiction and when the issues is raised, it is proper for the Court to inquire to what extent the Debtor is involved in the institution of an involuntary case."); *In re Global Ship Sys., LLC*, 391 B.R. 193, 204-05 (Bankr. S.D. Ga. 2007) ("a debtor's orchestration of an involuntary case is a fact which can be added to the non-exclusive list of criteria for evaluating good/bad faith.").

40. In this case, the evidence to date supports two inescapable conclusions: (i) that the Involuntary Case was filed for no legitimate purpose other than to frustrate Lender's second attempt at foreclosing on its collateral; and (ii) the filing of the Involuntary Case was at the orchestration of the Debtor and/or Mr. Hard.

41. Regarding the former conclusion, exactly like the pending Chapter 11 Case, the Involuntary Case was commenced before the Second Trustee's Sale—in fact on the morning thereof. (*Supra* at ¶ 28). The obvious effect of the filing and timing of both the Chapter 11 Case and Involuntary Case was to prevent Lender from exercising its state law foreclosure rights. Other than the Lender exercising its rights under the Agreement to foreclose, nothing had changed with respect to the Debtor's business landscape which would have warranted commencing the Involuntary Case. *In re Delray Assocs. Ltd. Pshp.*, 212 B.R. at 515-16 (a successive involuntary bankruptcy filing was inappropriate because it was anticipated under the confirmed plan that foreclosure rights could be exercised if the debtor's plan to sell or refinance failed). The Debtor, Mr. Hard and Henzel each knew that if the Debtor was unable to sell the Property or refinance Lender's Note, then the Lender would obtain stay relief in order to foreclose. Moreover, per the

9

terms of the 2nd Amended Plan and Confirmation Order, this outcome was a realistic possibility. To the extent that Henzel took issue with the possibility of Lender exercising its foreclosure rights upon a failure to sell or refinance, Henzel should have objected to the Agreement being approved or to the 2nd Amended Plan being confirmed. However, Henzel did not object and sat on his rights when had every opportunity to participate in the Debtor's Chapter 11 Case. Instead, Henzel filed this duplicitous and unnecessary Involuntary Case wasting both the Lender and Court's time with this superfluous action. To the extent, Henzel sought to stop the Second Trustee's Sale, why didn't he file a motion in the Chapter 11 Case to do so? Thus, it appears that the Debtor, Mr. Hard and Henzel seek a second bite at the apple in this Court in order to buy more time for the Debtor to refinance.[9] Accordingly, the Involuntary Case was not commenced for any legitimate purpose and was intended to stop Lender's Second Trustee's Sale. *In re Winn*, 49 B.R. at 239 (dismissing a serial involuntary petition for bad faith when the sole purpose was to obtain the benefit of the automatic stay in order to frustrate a creditor in its attempts to collect a judgment).

42. Regarding the latter conclusion, the facts strongly suggest that the Involuntary Case was orchestrated by the Debtor, Mr. Hard and Henzel in an effort to prevent Lender from foreclosing on the Property and to save whatever equity may exist in the Property. As admitted at the Deposition, the equity in the Property is part of Mr. Hard's overall retirement strategy and the Chapter 11 Case was initially filed to protect and enhance Mr. Hard's retirement. (*See supra* at ¶ 35(xxix)-(xxx)). When the Drop-Dead Date passed and the Debtor failed to either refinance Lender's Note or sell the Property, the Debtor and Mr. Hard were at imminent risk of losing the Property and any equity therein. Furthermore, pursuant to the terms of the Agreement, both the Debtor and Mr. Hard were prevented from objecting to Lender pursuing its state law rights to recommence its foreclosure and obtain the Comfort Order. Accordingly, the Debtor and Mr. Hard were out of options.

43. However, in a last minute effort to save the Property from foreclosure, Henzel, now acting through MAPS—which happens to share: (i) the same address as Henzel; (ii) the same $1,200,000 claim amount as Henzel; and (iii) the same status of being based upon a purported "loan" as Henzel—commenced this Involuntary Case. (*See supra* at ¶¶ 32-33 and 36). As admitted by the Debtor, Mr. Hard and Henzel have been friends for years and were onetime business partners. (*See supra* at ¶¶ 35(i)-(iii)). *In re Winn*, 49 B.R. at 240 (when the petitioning creditors are friends of the debtor they "were no doubt motivated to join in the involuntary petition by their desire to help the Debtor and not by their desire to pursue the Debtor in order to recover on their claims."). Furthermore, had Henzel truly been concerned about the collectability of his claim at any point prior to commencing the Involuntary Case why did he not: (i) commence the Involuntary Case prior to the Chapter 11 Case; (ii) institute any sort of collection action against the Debtor or Mr. Hard during the preceding 5-6 years his debt incurred; (iii) perfect a security interest as authorized under the Henzel Agreement; (iv) object to the approval of the Agreement; or (iv) object to the approval of the Agreement or confirmation of the 2nd Amended Plan? Instead, Henzel sat on his rights until the Debtor and Mr. Hard were out of viable options to prevent Lender

---

[9] Furthermore, permitting Henzel a second bite at the apple with this Involuntary Case would encourage all aggrieved unsecured creditors in single asset real estate cases to file involuntary petitions when the secured lender forecloses on its collateral per the terms of a confirmed plan. These types of superfluous proceedings would wreak havoc on the Court's docket and further delay legitimate foreclosures in the hope that an unsecured creditor—who failed to participate in the underlying Chapter 11 case—would be able to recover on its claim.

from exercising its rights. All of these facts create the impression, if not completely demonstrate, that the Involuntary Case was orchestrated by the Debtor and Mr. Hard, and that the Involuntary Case was filed in bad faith. Accordingly, this Court should dismiss the Involuntary Case.

44. Moreover, to the extent that Henzel acted out of protecting his interest as an unsecured creditor to any equity that may result from a sale of the Property, Henzel would have been adequately protected by permitting the Second Trustee's Sale to proceed. For instance, if the Property is as desirable as the Debtor asserts that it is, undoubtedly third parties would have shown up to the Second Trustee's Sale to produce a robust bidding environment as they may have realized the equity in the Property. All of the equity in the Property would have flowed directly to Henzel. Furthermore, Henzel could still pursue a deficiency judgment against Mr. Hard. Accordingly, Henzel's unsecured claim is adequately protected without the commencement of this duplicitous Involuntary Case.

**B. Examining the Specific Characteristics of Henzel's Purported "Claim" Along With the Course of Dealing Between the Parties, Henzel's Claim Should be Treated as Equity—not Debt—Thereby Making Dismissal of the Involuntary Case Appropriate.**

45. In the Tenth Circuit, a bankruptcy court may use its equitable powers under Section 105(a) of the Bankruptcy Code to recharacterize putative debt when its characteristics demonstrate that its substance is really equity. *See Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1149 (10th Cir. 2015) (citing *In re Hedged-Investments Assocs., Inc.*, 380 F.3d 1292, 1297 (10th Cir. 2004)). Upon recharacterizing a loan as equity, a "claimant may not proceed in bankruptcy—since he no longer holds an allowed 'claim'—he may still hold a valid interest in equity to be paid upon satisfaction of the debtor's other outstanding obligations.". *Id*. at 1148. Accordingly, recharacterizing debt as equity requires the Court to look to the true substance of the obligation to determine whether the obligation held by the purported "creditor" actually holds the hallmarks of true debt. *Gernsbacher v. Campbell (In re Equip. Equity Holdings, Inc.)*, 491 B.R. 792, 848 (Bankr. N.D. Tex. 2013) ("recharacterization involves treating what is likely labeled as a 'debt' as an equity interest ('if it looks like a duck and quacks like a duck, it must be a duck')").

46. The inquiry into whether recharacterizing debt to equity is highly fact intensive and the Court is to apply the following factors:

> (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to other corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) the identity of interest between the creditor and stockholder; (10) the source of interest payments; (11) the ability of the corporation to obtain loans from outside lenders; (12) the extent to which funds were used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.

*In re Hedged-Investments Assocs., Inc.*, 380 F.3d at 1298.

47. In this case, Lender submits that the 1st, 2nd, 3rd, 4th, 6th, 11th, 12th and 13th factors favor recharacterizing Henzel's claim against the Debtor's estate from putative debt to equity. As acknowledged by the Tenth Circuit, "the *Hedged-Investment* factors are not exclusive, and no single factor is dispositive." *In re Alternate Fuels*, 798 F.3d at 1149. Once Henzel's debt is properly recharacterized to equity, this Involuntary Case fails as a matter of law because there is no petitioning creditor under Section 303 of the Bankruptcy Code.

   i. **The First Factor – Names Given to the Certificates Evidencing the Indebtedness.**

48. While the name affixed to the Henzel Agreement is "Agreement", the substance of the rights between the parties largely points towards equity—not debt—and the behavior of the parties supports the conclusion. (*See* Ex. D). First, notwithstanding the absence of an express rate of interest, Henzel has the right to receive more than the $1,200,000 he allegedly lent the Debtor by receiving: (i) monthly rental payments from the Reloni lease, (ii) portions of distributions that Mr. Hard would receive as a member of Reloni (referred to as bonuses), and (iii) additional monies received upon a sale of the building. (*See* Ex. D at §§ 2-4). To the extent that the Debtor were able to receive an interest free loan from a true third-party creditor, why would the Debtor ever agree to pay the creditor more than what it is legally obligated to pay? However, under the terms of the Henzel Agreement, the Debtor has obligated itself to pay Henzel more than the face amount of $1,200,000. (Ex. D at ¶¶ 2-4; *supra* at ¶ 35(xix)). Accordingly, this aspect of the Henzel Agreement purports to align Henzel's ability to repaid with the success of the Debtor's business which has the hallmark of an investment.

49. Furthermore, Mr. Hard personally guaranteed the obligations under the Henzel Agreement. (Ex D p. 4). However, when the Debtor sought financing from third parties to refinance Lender's Note, Mr. Hard—despite certifying to the proposed lender under oath—failed to include his guaranty of the Henzel Agreement on his personal financial statement as a liability (*Supra* at ¶ 35(xxviii)). Such an omission leads to the conclusion that Mr. Hard himself does not even consider his obligations under the Henzel Agreement to be true debt—notwithstanding that the Henzel Agreement is, admittedly, in default. (*Supra* at ¶ 35(xx)). This conclusion is further supported by the fact that Mr. Hard and Henzel are friends and, despite the Debtor being in default at the time it was entered into, Henzel has never taken any legal action to recover any amounts due under the Henzel Agreement. (*Supra* at ¶ 35(ii), (xx) and (xxiii)). Thus, the name of the Henzel Agreement has no bearing on its true substance as being characterized as equity especially when examining the parties' course of dealing. Accordingly, the first *Alternate Fuels* factor favors recharacterization.

   ii. **The Second Factor – Presence or Absence of a Fixed Maturity Date.**

50. Pursuant to the terms of the Henzel Agreement, there is no fixed maturity date by which the Debtor is required to repay its obligations to Henzel. (*See* Ex. D). As acknowledged by the Debtor, the repayment of Henzel's debt may never be required if the Debtor cannot sell the Property. (*See supra* at ¶ 35(xxii)). Henzel and the Debtor could have included a "due on sale" clause in the Henzel Agreement had the parties intended for maturity of the obligation to occur upon a sale. However, the Henzel Agreement is silent with respect to the maturity of the

12

obligations thereunder. "[T]he presence of a definite maturity date and a definite obligation to repay is a highly significant feature of a debtor-creditor relationship." *Stinnet's Pontiac Serv., Inc. v. Comm'r of IRS*, 730 F.2d 634, 638 (11th Cir. 1984) (citing *Dillin v. United States*, 433 F.2d 1097, 1101 (5th Cir. 1970)); *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001) ("The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."). Accordingly, the second *Alternate Fuels* factor favors recharacterization.

### iii. The Third Factor – The Source of Payments.

51. The "source of payments" factor looks at "whether the lender has any reasonable expectation of payment if the business fails." *In re Alternate Fuels, Inc.*, 789 F.3d at 1158-59 (citing *In re Lexington Oil & Gas Ltd., Co.*, 423 B.R. 353, 366 (Bankr. E.D. Okla. 2010)). In this case, the source of payments under the Henzel Agreement are entirely dependent upon the Debtor entering into the lease with Reloni, *i.e.*, the Debtor must be successful in its venture to lease the Property to Reloni for Henzel to be repaid. (*See* Ex. D at §§ 2-5). In fact, the Debtor testified that the ability to repay Henzel is "contingent" upon entering into the Reloni lease which, as acknowledged by the Debtor, was a legal impossibility at the time it entered into the Henzel Agreement. (*See supra* at ¶ 35(xvii)). Curiously, if the Reloni lease is never entered into and the Property is never sold, the Henzel Agreement contains no payment provisions. (*See* Ex. D). Moreover, the Henzel Agreement does not contain any default provisions, remedies provisions, or an acceleration clause. (*See* Ex. D). Lastly, under the Henzel Agreement, the Debtor granted Henzel a security interest in its assets which Henzel never bothered to perfect. (*See supra* at ¶ 35(xxi)). If the Debtor's business fails, Henzel has no contractual expectation of repayment, and no perfected secured claim against the Debtor's assets. Therefore, the third *Alternate Fuels* factor heavily favors recharacterization.

### iv. The Fourth Factor – The Right to Enforce Payment of Principal and Interest.

52. Other than a provision that states Missouri law applies, the Henzel Agreement does not contain any default or remedies provisions. (*See* Ex. D). As acknowledged at the Deposition, Henzel has never sought to enforce his rights under the Henzel Agreement with respect to the Original Debt (the $785,000) or the New Debt (the $415,000). (*Supra* at ¶ 35(xxiii)). Furthermore, Henzel has never sought to enforce his rights against Mr. Hard as guarantor of the Debtor's obligations. (*Id.*). Moreover, notwithstanding having the ability to perfect a security interest in the Debtor's assets pursuant to the Henzel Agreement, Henzel has never perfected such interest. (*See supra* at ¶ 35(xxi)). While there may be an implied right to pursue a breach of the Henzel Agreement under Missouri law, Henzel's conduct and course of dealing with the Debtor demonstrates that the right to enforce the terms of the Henzel Agreement have never been, and are highly unlikely to be, exercised. Accordingly, the fourth *Alternate Fuels* factor strongly favors recharacterization.

     v.       **The Sixth Factor – The Status of the Contribution in Relation to Other Corporate Creditors.**

53. The Debtor's only unsecured creditors—as admitted in the Chapter 11 Case—were Xcel, Owners Insurance Agency and Henzel. As set forth above, the Debtor paid Xcel in full post-petition in the Chapter 11 Case. (*Supra* at fn. 3). Owners Insurance Agency has asserted a claim against the Debtor in connection with a lawsuit pending in the United States District Court for the District of Colorado. (*Supra* at ¶ 1). To the extent that Owners Insurance Agency is successful in obtaining a money judgment, or if any portion of Lender's claim turns out to be unsecured, recognizing Henzel's claim as debt has the effect of diluting the recovery of other true third-party unsecured creditors who are not friends or former business partners with Mr. Hard. Moreover, the Debtor testified that nearly 2/3 of Henzel's claim (the Original Debt) was used to pay obligations for Mr. Hard's other wholly owned entities—and not obligations belonging to the Debtor. (*Supra* at ¶ 35(xiii) and (xv)). However, when the Debtor entered into the Henzel Agreement, Henzel was given the ability to effectively roll up his Original Debt by extending the New Debt. Accordingly, Henzel improved his position vis-à-vis other creditors for which such debt may not actually belong to the Debtor. Thus, the sixth *Alternate Fuels* factor favors recharacterization.

     vi.      **The Eleventh Factor – The Ability of the Corporation to Obtain Loans From Outside Lenders.**

54. Prior to entering into the Henzel Agreement, and incurring the New Debt, the Debtor testified that it did not look to borrow funds from any other person to find better lending terms. (*See supra* at ¶ 35(xxvii)). "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *In re Autostyle Plastics*, 269 F.3d 726, 752 (6th Cir. 2001). Accordingly, the eleventh *Alternate Fuels* factor favors recharacterization.

     vii.     **The Twelfth Factor – The Extent to Which Funds Were Used to Acquire Capital Assets.**

55. As acknowledged at the Deposition, the funds from the Original Debt were used to purchase equipment and capital expenditures for Mr. Hard's wholly owned entity Hi-Tech Recycling. (*Supra* at ¶ 35(xiii)). Furthermore, there were no restrictions placed upon the Debtor with respect to how it utilized any portion of the funds which could have included purchasing capital assets, paying non-debtor obligations and any other purpose the Debtor desired. (*Supra* at ¶ 35(xiv)-(xv)). Accordingly, the unfettered discretion to use the money under the Henzel Agreement demonstrates that the twelfth *Alternate Fuels* factor supports recharacterization.

     viii.     **The Thirteenth Factor – The Failure of the Debtor to Repay on the due Date or to Seek a Postponement.**

56. The Debtor testified that it was uncertain, with respect to the Old Debt, as to how much of the debt had been paid over the last five to six years to Henzel. (*Supra* at ¶ 35(ix)-(xi)). Moreover, the Henzel Agreement does not contain any maturity date for the obligations to be paid

14

thereunder so the Debtor had no obligation to repay on a specific date or necessity to ask for a postponement. (*Supra* at ¶ 35(xi) and (xxii)). Accordingly, the thirteenth *Alternate Fuels* factor favors recharacterization.

### ix. Because Henzel's Claim Should be Recharacterized, his Involuntary Petition Fails Because There is no Petitioning Creditor.

57. As set forth above, the Court has ample justification to recharacterize Henzel's claim from debt to equity under the applicable *Alternate Fuels* factors. Upon recharacterizing a loan as equity, a "claimant may not proceed in bankruptcy—since he no longer holds an allowed 'claim'—he may still hold a valid interest in equity to be paid upon satisfaction of the debtor's other outstanding obligations.". *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d at 1148. After recharacterizing Henzel's purported claim as equity, the involuntary petition fails as a matter of law because there is no petitioning creditor. 11 U.S.C. § 303(b)(2) (requiring there to be at least 1 petitioning creditor with debt exceeding $15,775). Accordingly, the Court should dismiss this Involuntary Case.

WHEREFORE, Lender respectfully requests for the reasons stated above that the Court enter its Order which dismisses this Involuntary Case and for such other and further relief this Court deems fair and proper under the circumstances.

**Dated:** Denver, Colorado
January 25, 2019

MOYE WHITE LLP

s/ *Timothy M. Swanson*
Timothy M. Swanson, #47267
David A. Laird, #31067
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202
Email: tim.swanson@moyewhite.com
  david.laird@moyewhite.com
Phone: (303) 292-2900
Fax:  (303) 292-4510
*11380 East Smith RD Investments, LLC*