# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | |
| 11380 SMITH ROAD, LLC, ) | Case No. 19-10286(TBM) |
| EIN: 46-4766309, ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| ) | |

## 11380 EAST SMITH RD INVESTMENTS, LLC'S, MOTION FOR RELIEF FROM AUTOMATIC STAY PURSUANT TO SECTION 362(D)(1) AND (4) OF THE BANKRUPTCY CODE

COMES NOW 11380 East Smith RD Investments, LLC ("**Lender**"), the Debtor's sole secured lender, for its Motion for Relief From Automatic Stay Pursuant to Section 362(d)(1) and (4) of the Bankruptcy Code (the "**Motion**"). In support of the Motion, Lender states as follows:

### I.     Introduction

1. Lender seeks an order granting it relief from the automatic stay pursuant to Section 362(d)(1) and (4) of the Bankruptcy Code so that it may proceed—*for the third time*—with its state law foreclosure against the real property commonly known as 11380 East Smith Road, Aurora, Colorado 80010 (the "**Property**"). As the Court is familiar, this single asset real estate Debtor in this involuntary bankruptcy case is already a debtor in this Court but in its own voluntary Chapter 11 case (the "**Chapter 11 Case**"). (Case No. 18-10965(TBM)).[1] The Court may recall from Lender's previously filed stay relief motion in the Chapter 11 Case that the Debtor sought bankruptcy protection on the eve of Lender's state law public trustee's sale nearly 4 months following the date Lender's note had matured. Notwithstanding that Lender asserted the Chapter 11 Case was filed in bad faith under the applicable *Little Creek* factors thereby warranting stay relief and/or dismissal of the Chapter 11 Case, Lender, Debtor, and Debtor's principal ("**Mr. Hard**") entered into a stipulated agreement that would allow the Debtor to either refinance the Lender's note or sell the Property prior to January 1, 2019 (the "**Drop-Dead Date**"). If the Debtor was unable to get a deal done prior to the Drop-Dead Date, then Lender would be granted relief from the automatic stay. The terms of the stipulated agreement were subsequently incorporated into the Debtor's confirmed Chapter 11 plan.

2. The Drop-Dead Date passed and the Lender—pursuant to the terms of its stipulated agreement with the Debtor—obtained relief from the automatic stay to recommence its public trustee's sale. However, on the morning of the second public trustee's sale on January 16, 2019, Tim Henzel ("**Henzel**"), one of the Debtor's alleged creditors who was a party in the Chapter 11 Case—now purportedly acting through an entity known as Mid America Plastic Systems

---

[1] All citations to the record in the Chapter 11 Case will be styled as "Chp. 11 Docket No. ___".

("**MAPS**")—commenced this involuntary bankruptcy case thereby frustrating Lender's second attempt to liquidate its collateral at a public trustee's sale. In connection with the Chapter 11 Case, Lender discovered that Henzel was not only a former business partner with Mr. Hard, but also a friend. Henzel/MAPS is represented in this involuntary bankruptcy case by the same attorney who represented Mr. Hard personally in the Chapter 11 Case.

3. Like in the Chapter 11 Case, Lender hereby moves for relief from the automatic stay for "cause", pursuant to Section 362(d)(1) of the Bankruptcy Code, because: (a) the involuntary case was filed in bad faith; and (b) the terms of the stipulated agreement, including the stay relief provision, apply in subsequent cases arising under Title 11 of the United States Code, which would include this involuntary case. Lender also moves for relief from the automatic stay pursuant to Section 362(d)(4) of the Bankruptcy Code as the filing of this involuntary case was part of a scheme of to intentionally delay, hinder, or defraud Lender's lawful exercise of its state law foreclosure rights.

## II. Jurisdictional Statement

4. This Court has jurisdiction over this involuntary bankruptcy case pursuant to 28 U.S.C. §§ 157(a)-(b), and 1334(a)-(b). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper in this Court pursuant to 28 U.S.C. § 1409. The statutory and rule based predicates for the relief requested in the Motion are Sections 362(d)(1) and (4) of the Bankruptcy Code, Rules 4001 of the Bankruptcy Rules and L.B.R. 4001-1.

## III. Background

A. **The Debtor's Loan Obligations.**[2]

5. On October 25, 2016, the Debtor made, executed, and delivered its promissory note to Lender in the principal amount of $3,000,000 (the "**Note**") as required under that certain loan agreement between Debtor and Lender. A true and correct copy of the Note and loan agreement are attached hereto as Exhibit A.

6. The obligations due and owing under the Note are secured by a first-position security interest against the Property (the "**DOT**"). Lender perfected its lien against the Property, on October 26, 2016, when it recorded a copy of the DOT with the Clerk and Recorder of Adams County, Colorado, as Reception No. 2016000091839. A true and correct copy of the DOT is attached hereto as Exhibit B.

7. The Debtor's authorized representative is Mr. Hard who also personally guaranteed all amounts due and owing under the Note. A true and correct copy of the Affidavit of Mr. Patrick Dunn is attached hereto as Exhibit C.

---

[2] A more thorough description of the Debtor's loan obligations and collateral package with the Lender, along with copies of the relevant loan documents, is set forth in paragraphs 5 through 14 of Lender's *Motion: (I) for Relief From the Automatic Stay Pursuant to Section 362(d)(1) of the Bankruptcy; and (II) to Dismiss This Chapter 11 Bankruptcy Case for Bad Faith Pursuant to Section 1112(b) of the Bankruptcy Code* (Chp. 11 Docket No. 70) (the "**Stay Relief/Dismissal Motion**").

8.  Debtor failed to make the regular payments due under the Note for the months of July 2017, August 2017, September 2017, and October 2017. (Ex. C at ¶ 11).

9.  On October 25, 2017, the Note matured by its terms, and the Debtor failed to repay the obligations due and owing thereunder according to the terms thereof. (*Id.* at ¶ 12).

10.  Prior to the commencement of the Chapter 11 Case (defined below), Lender had properly noticed a Sale of the Property that was set for February 14, 2018 at 10:00 a.m. (the "**Trustee's Sale**"). (*Id.* at ¶ 13).

**B.    Background Regarding the Debtor's Currently Pending Chapter 11 Bankruptcy Case.**

11.  On February 13, 2018—*the eve of the Trustee's Sale*—the Debtor initiated its Chapter 11 Case when it filed its voluntary petition for relief. (Chp. 11 Docket No. 1).

12.  The Debtor filed the Chapter 11 Case as a single asset real estate entity as such term is defined under Section 101(51B) of the Bankruptcy Code, and identified the Property as the Debtor's only meaningful asset. (*Id.* at p. 2 and 15).[3]

13.  The Debtor's Amended Schedule F identified only three unsecured creditors: (i) Henzel in the amount of $1,200,000 for a purported loan, (ii) Owners Insurance Company in an "unknown" amount that is disputed, contingent, and unliquidated, and (iii) Xcel Energy in the amount of $32,000.[4] (Chp. 11 Docket No. 37).

14.  The Debtor is owned entirely by Mr. Hard. (Chp. 11 Docket No. 5).

15.  On April 10, 2018, the Lender filed its Stay Relief/Dismissal Motion. (Chp. 11 Docket No. 70).

16.  In the Stay Relief/Dismissal Motion, Lender argued that it should be granted relief from the automatic stay, or that the entire Chapter 11 Case be dismissed, on the basis that the filing of the Chapter 11 Case satisfied the relevant *Little Creek* factors including: (i) the Debtor's only asset is the Property which is encumbered by Lender's lien; (ii) the Debtor has only 1 employee;[5] (iii) the Debtor only had 2 other unsecured creditors and that Henzel's purported claim appeared

---

[3] The Debtor's Schedule B in the Chapter 11 Case identified only three assets: (i) intercompany loans between the Debtor and two entities which Mr. Hard was the sole owner of in the amount of $4,365,682.00 which the Debtor acknowledged are likely uncollectible; (ii) A/R in the amount of $135,752.22; and (iii) a legal claim against an insurance company relating to a hail damage claim that the Debtor values at $2,500,000. (Chp. 11 Docket No. 1 at p. 13-15).

[4] At the first meeting of creditors, the Debtor testified that Xcel's debt had been paid in full post-petition. (Chp. 11 Docket No. 70 at ¶ 25(x).

[5] Upon testifying under oath at the Deposition, the Debtor admitted that it actually has no employees.

to be questionable;[6] (iv) the Debtor commenced the Chapter 11 Case on the eve of the Trustee's Sale; and (v) the Debtor had no business to reorganize. (*See id.*).

17. On May 1, 2018, the Lender deposed the Debtor's representative, Mr. Hard, regarding numerous topics in advance of a trial on the Stay Relief/Dismissal Motion including the particular aspects of Henzel's purported claim in the amount of $1,200,000 (the "**Deposition**"). A true and correct copy of the transcript from the Deposition is attached hereto as Exhibit D.

18. On May 15, 2018, the Lender and Debtor entered into that certain Stipulated Agreement regarding, *inter alia*, the treatment of Lender's claim during the Chapter 11 Case, and Lender's rights and remedies upon the occurrence or non-occurrence of certain events in the Chapter 11 Case (Chp. 11 Docket No. 98-2) (the "**Agreement**").

19. The Agreement allowed the Debtor to either sell the Property or refinance Lender's Note no later than January 1, 2019, *i.e.*, the Drop-Dead Date. (*Id*. at ¶ 2). If the Drop-Dead date occurred, Lender was then authorized to, *inter alia*, obtain agreed relief from the automatic stay in order to "exercise all remedies under applicable non-bankruptcy law against the Property." (*Id*. at ¶ 4). The Debtor agreed that if the Chapter 11 Case were ever dismissed that it would not re-file a subsequent bankruptcy case under any Chapter of the Bankruptcy Code. (*Id*. at ¶ 5(e)).

20. Importantly, Section 13 of the Agreement states the following:

> **SURVIVAL**. *The terms of this Agreement shall survive* the appointment of, and be binding upon, any trustee that may subsequently be appointed in the Chapter 11 Bankruptcy Case or upon a conversion of the Bankruptcy Case to Chapter 7 under the Bankruptcy Code, or upon dismissal of the Bankruptcy Case or *any other case pending under title 11 of the United States Code*.

(*Id*. at ¶ 13).

21. Mr. Hard, in his individual capacity and as guarantor of the Note, was also a party to the Agreement and was represented by Mr. Barber during the course of negotiating the Agreement. (*Id.* at p. 10 and 15).

22. The motion to approve the Agreement was served on the Debtor's estate including Henzel. (Chp. 11 Docket No. 107-1). Henzel did not object to the approval of the Agreement.

23. On June 29, 2018, the Court entered its Order Approving the Agreement in full. (Chp. 11 Docket No. 110).

---

[6] As set forth in the Stay Relief/Dismissal Motion, Lender questioned the validity and legitimacy of Henzel's claim due to the amount alleged, the personal relationship between Mr. Hard and Henzel, and Henzel's indifference with respect to enforcing his claim. (*See* Chp. 11 Docket No. 70, p. 9 at fn. 2) ("Henzel's claim raises additional questions as to its legitimacy. Apparently, Henzel is someone who the Debtor has known over the years who happened to loan the Debtor approximately $1.2 million in order to improve property formerly owned by the Debtor. However, Henzel never took a security interest in the property that his loan proceeds were used to improve. Given the length of relationship between the Debtor and Henzel along with the failure to take any collateral to secure a $1.2 million loan, Lender questions whether Henzel's claim is truly legitimate and at arm's length.").

24. On September 20, 2018, the Debtor filed its: (i) Second Amended Plan of Reorganization (Chp. 11 Docket No. 123) (the "**2nd Amended Plan**"); and (ii) Second Amended Disclosure Statement (Chp. 11 Docket No. 124) (the "**2nd Amended Disclosure Statement**").

25. The 2nd Amended Plan states that "[t]he terms and conditions of the [] Agreement are incorporated into and made a part of this Plan. A copy of the [] Agreement is attached hereto as Exhibit '1'." (Chp. 11 Docket No. 123, p. 8 at § 4.2). In fact, as proposed under the 2nd Amended Plan, the Agreement was attached as an exhibit.[7] (Chp. 11 Docket No. 123-1).

26. On September 27, 2018, the Debtor served both the 2nd Amended Plan and 2nd Amended Disclosure Statement upon Henzel. (Chp. 11 Docket No. 130). Henzel did not object to the terms of the 2nd Amended Plan or 2nd Amended Disclosure Statement.

27. On October 31, 2018, the 2nd Amended Plan, with the terms of the Agreement expressly incorporated therein, was confirmed (the "**Confirmation Order**"). (Chp. 11 Docket No. 138).

**C.   Background Regarding Events Subsequent to the Drop-Dead Date.**

28. The Debtor was unable to sell the Property or refinance Lender's Note prior to the occurrence of the Drop-Dead Date. Accordingly, on January 2, 2019, Lender filed its *Notice of Occurrence of Drop-Dead Date and Agreed Relief From Automatic Stay Pursuant to Section 4(b) of the Court Approved Stipulated Agreement* (Chp. 11 Docket No. 159) (the "**Stay Relief Notice**").

29. In furtherance of the Stay Relief Notice, the Court entered a *Comfort Order Granting Relief From Automatic Stay Pursuant to Section 4(b) of Court Approved Stipulated Agreement* (Chp. 11 Docket No. 160) (the "**Comfort Order**").

30. Upon entry of the Comfort Order, Lender proceeded to re-commence its Trustee's Sale with the Adams County Public Trustee for January 16, 2019 at 10:00 a.m. (the "**Second Trustee's Sale**").

31. On January 16, 2019, approximately 33 minutes before the Second Trustee's Sale was scheduled to begin, Lender received notice from the Adams County Public Trustee that this involuntary bankruptcy case had been filed earlier that morning thereby staying the Second Trustee's Sale. Attached as <u>Exhibit E</u> is a true and correct copy of the notice of the commencement of this involuntary case.

---

[7] Furthermore, prior to confirming the 2nd Amended Plan, the Court entered an order approving a stipulation between the Parties which provided that "[f]or the avoidance of doubt, to the extent any provision of the Plan conflicts with the Stipulated Agreement, then the terms of the Stipulated Agreement shall control in all circumstances." (*See* Chp. 11 Docket Nos. 132, 132-1 at ¶ 2, and 137).

4848-7037-6582.1

**D.     Background Regarding This Involuntary Bankruptcy Case.**

32.    The petition filed in this involuntary bankruptcy case (the "**Involuntary Case**") does not contain much information other than: (i) the only petitioning creditor is Mid America Plastic Systems ("**MAPS**"); (ii) the nature of MAPS' claim is for "money loaned"; (iii) the amount of MAPS' claim is for $1,200,000; (iv) Henzel signed the involuntary petition as MAPS' representative; and (v) MAPS seeks relief under Chapter 7 of the Bankruptcy Code. (Docket No. 2).

33.    Mr. Barber, who represented Mr. Hard in negotiating the terms of the Agreement as a guarantor of Lender's Note, signed and filed the involuntary petition as counsel for MAPS. (*Id*.).

34.    The Debtor appears to be represented by different counsel in this Involuntary Case than in the Chapter 11 Case. (Docket No. 4).

35.    On January 24, 2019, Lender filed its Motion for Entry of Order requesting that the Court grant Lender relief from the automatic stay pursuant to Sections 4(b) and 13 of the Agreement (the "**Motion to Enforce Agreement**") (Docket No. 6).

36.    On January 25, 2019, Lender filed its Motion to Dismiss Involuntary Bankruptcy Case (Docket No. 7) (the "**Dismissal Motion**").  The Dismissal Motion seeks dismissal on the basis that: (i) the Involuntary Case was filed in bad faith and for no legitimate purpose other than to frustrate Lender's state law foreclosure rights; and (ii) Henzel/MAPS' claim against the Debtor should be recharacterized from debt to equity thereby eliminating Henzel/MAPS' status as a petitioning creditor under Section 303 of the Bankruptcy Code.

37.    On January 30, 2019, the Court denied the Motion to Enforce Agreement without prejudice and further stated that "a new motion for relief from stay must be filed in this Involuntary Case [and] [a]ny new motion for relief from stay may be predicated on the Stipulated Agreement." (Docket No. 10 at p. 1).

**E.     Background Regarding Henzel's Purported Claim.**

38.    Henzel's purported claim in the Chapter 11 Case, in the amount of $1,200,000 for a "loan", appears to be the exact same claim now asserted by MAPS in this Involuntary Case, also in the amount of $1,200,000 for "money loaned".

39.    In the Chapter 11 Case, the Debtor scheduled Henzel's address at 1510 Jade Road, Columbia, Missouri 65201.  And in this Involuntary Case, MAPS identifies its address as 1510 Jade Road, Columbia, Missouri.

40.    Prior to the Deposition, the Debtor produced the most "current" agreement evidencing Henzel's purported claim of $1,200,000 (the "**Henzel Agreement**").  A true and correct copy of the Henzel Agreement is attached hereto as Exhibit F.

4848-7037-6582.1

41. The Debtor testified to, *inter alia*, the following facts regarding Henzel, the Henzel Agreement, and the Debtor's relationship with Henzel:

   i. Mr. Hard has known Henzel for between 10 and 20 years. (44:19-45:7).

   ii. Mr. Hard and Henzel are friends. (45:8-11).

   iii. Mr. Hard and Henzel were former business partners in 3555 Moline, LLC. (45:12-16).

   iv. As of the date of the Deposition, the Debtor's only creditors were Xcel, Henzel, and Owners Insurance Agency. (43:24-44:13).

   v. As of the petition date in the Chapter 11 Case, the Debtor purportedly owes Henzel $1,200,000. (45:17-19).

   vi. The most current agreement with Henzel is the Henzel Agreement. (46:24-47:2).

   vii. There may, or may not, be three or four promissory notes evidencing Henzel's claim for $1,200,000. (47:15-20).

   viii. Whenever the Debtor needed money from Henzel, all it had to do was call Henzel. There was no formal procedure to receive money. (48:1-9).

   ix. As of the date of the Deposition, Henzel's claim was about five years old. (48:18-19).

   x. As of the date of the Deposition, $785,000 of Henzel's $1,200,000 claim is potentially between five and six years old (the "**Original Debt**"). (49:21-23).

   xi. The Debtor was uncertain of whether the Original Debt with Henzel: (i) had a maturity date, (ii) accrued interest, (iii) the Debtor was ever required to make scheduled payments to Henzel; and (iv) what amounts were, in fact, actually paid to Henzel. (50:7-25).

   xii. The Debtor never adopted a formal resolution authorizing the Original Debt or the additional $415,000 (the "**New Debt**") borrowed under the Henzel Agreement. (51:8-13; 60:12-19).

   xiii. The funds from the Original Debt were used to purchase equipment and capital expenditures including for Mr. Hard's wholly owned entity Hi-Tech Recycling. (51:17-21; 52:13-25).

   xiv. There were no restrictions placed upon the Debtor as to how it desired to spend the $1,200,000 borrowed from Henzel. (53:4-15).

4848-7037-6582.1

xv. The $1,200,000 was used to pay obligations of not only the Debtor, but obligations of all of Mr. Hard's personally owned entities. (53:16-54:11; 57:18-58:25).

xvi. Upon selling the Debtor's real property located at 3555 Moline Street, Aurora, Colorado (the "**Moline Property**"), for $3,900,000, the Debtor did not use any sale proceeds therefrom to repay Henzel but instead used such proceeds to pay debts of Mr. Hard's other wholly owned entities. (22:17-23; 54:19-55:6).

xvii. The repayment of Henzel, under the terms of the Henzel Agreement, is wholly contingent upon the Debtor entering into a new lease with Reloni Group, LLC ("**Reloni**"), which such lease was never entered into and is ineffective. (66:19-24; 80:13-16).

xviii. The Debtor admits that because the Reloni lease never became effective, Henzel's claim fails. (133:10-17).

xix. The repayment of Henzel's debt under the Henzel Agreement allowed Henzel to be paid more than $1,200,000 of debt he is purportedly owed despite the fact there is no interest rate contained in the Henzel Agreement. (75:22-76:23).

xx. At the time the Debtor entered into the Henzel Agreement, the Debtor was immediately in default thereof. (78:10-13).

xxi. Despite purportedly lending the Debtor $1,200,000, and the Henzel Agreement granting Henzel a security interest in all monies received from Reloni, Henzel never perfected a security interest to secure the purported loan of $1,200,000. (47:21-22; 78:14-17).

xxii. So long as the Debtor owns the Property, then there is no fixed maturity date to repay the $1,200,000 to Henzel under the Henzel Agreement. (78:18-79:1).

xxiii. Henzel has never taken any legal action against either the Debtor or Mr. Hard (as guarantor) to recover any portion of the $1,200,000 he purportedly loaned to the Debtor. (79:8-13; 80:21-23).

xxiv. The Henzel Agreement contains no default provisions. (79:14-19).

xxv. The Henzel Agreement contains no remedies provisions. (80:6-8).

xxvi. Henzel could not accelerate the obligations under the Henzel Agreement on account of any defaults by the Debtor. (80:17-20).

xxvii. Prior to entering into the Henzel Agreement and obtaining the New Debt, the Debtor did not look to borrow funds from any other person to find better terms. (81:8-18).

8
4848-7037-6582.1

    xxviii.    In connection with providing a personal financial statement to a prospective lender to refinance the Note, Mr. Hard did not list in his personal liabilities his obligations under the Henzel Agreement despite guaranteeing the obligations thereunder. (245:1-249:12).

    xxix.    Obtaining equity from the sale of the Property is part of Mr. Hard's overall personal retirement strategy. (190:19-25).

    xxx.    Protecting the equity in the Property and enhancing Mr. Hard's personal retirement was one of the reasons the Debtor commenced the Chapter 11 Case. (191:12-21).

    xxxi.    Mr. Hard's wholly owned plastics company had dealings with Henzel for many years. (44:14-18).

42.    Given that: (i) the claim amounts of Henzel and MAPS are identical, (ii) the addresses of Henzel and MAPS are identical, (iii) Mr. Hard testified that the Debtor has no other claims other than Xcel, Owners Insurance Agency, and Henzel, (iv) the Debtor's schedules and 2nd Amended Plan filed under oath in the Chapter 11 Case identify only Henzel—not MAPS, and (v) Mr. Hard's relationship with Henzel spans numerous years as friends, business partners, and a purchaser of equipment, the claim of Henzel and MAPS is the same claimant.[8]

### IV.    Relief Requested

43.    Lender requests that the Court grant Lender relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code for "cause" because: (a) the Involuntary Case was filed in bad faith; and (b) the terms of the Agreement survived the Chapter 11 Case and are applicable herein. Lender further requests that the Court grant relief from the automatic stay pursuant to Section 362(d)(4)(B) because the filing of the Involuntary Case was part of a scheme to delay, hinder, or defraud Lender from validly exercising its state law foreclosure rights.

### V.    Argument

**A.**    **"Cause" Exists, Pursuant to Section 362(d)(1) of the Bankruptcy Code, Because This Involuntary Case was Filed in Bad Faith.**

44.    The Tenth Circuit Court of Appeals has recognized that a bankruptcy case that is filed in bad faith can serve as independent "cause" for purposes of Section 362(d)(1). *See In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996); *Pacific Rim Invs., LLP v Oriam, LLC (In re Pacific Rim Invs., LLP)*, 243 B.R. 768 (D. Colo. 2000). As set forth in the Stay Relief/Dismissal Motion, Lender asserted that "cause" existed, under Section 362(d)(1) of the Bankruptcy Code, because the Chapter 11 Case was filed in bad faith under the applicable *Little Creek* factors. (Chp. 11 Docket No. 70 at ¶¶ 33-36). Lender submits that many of the same facts

---

[8] Lender has challenged the validity of Henzel's claim in the Dismissal Motion requesting that the Court recharacterize the claim from debt to equity under the principles set forth in *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1149 (10th Cir. 2015). (*See* Docket No. 7 at ¶¶ 45-57).

and arguments supporting relief from the automatic stay that were made in the Chapter 11 Case also support stay relief in this Involuntary Case.

45. Furthermore, as discussed in detail in the Dismissal Motion, other bankruptcy courts have found that involuntary bankruptcy cases were filed in bad faith when they are filed by petitioning creditors with no legitimate purpose, or the case was filed by the petitioning creditors at the orchestration of the debtor. *See In re Delray Assocs. Ltd. Pshp.*, 212 B.R. 511 (Bankr. D. Md. 1997) (dismissing involuntary petition as it was a serial filing in bad faith which was orchestrated by the single asset real estate debtor in order to prevent a secured creditor from foreclosing its deed of trust); *In re VII Holdings, Co.*, 362 B.R. 663, 666 (Bankr. D. Del. 2007) (analyzing whether non-petitioning creditor can recover damages against a petitioning creditor for an "involuntary petition [that] was filed in bad faith and 'for no other purpose than to improperly frustrate the [foreclosure] efforts" of two secured creditors after stay relief was obtained in an earlier filed bankruptcy case.); *In re Winn*, 49 B.R. 237, 239 (Bankr. M.D. Fla. 1985) ("[W]hether it is voluntary or involuntary, the Court must protect the integrity of its jurisdiction and when the issue is raised, it is proper for the Court to inquire to what extent the Debtor is involved in the institution of an involuntary case."); *In re Global Ship Sys., LLC*, 391 B.R. 193, 204-05 (Bankr. S.D. Ga. 2007) ("a debtor's orchestration of an involuntary case is a fact which can be added to the non-exclusive list of criteria for evaluating good/bad faith.").

46. In this case, the evidence to date supports two inescapable conclusions: (i) that the Involuntary Case was filed for no legitimate purpose other than to frustrate Lender's second attempt at foreclosing on its collateral; and (ii) the filing of the Involuntary Case was at the orchestration of the Debtor and/or Mr. Hard. Accordingly, under the case law cited in the previous paragraph, the case was filed in bad faith thereby constituting "cause" for purposes of Section 362(d)(1) of the Bankruptcy Code.

47. Regarding the former conclusion, exactly like the pending Chapter 11 Case, the Involuntary Case was commenced before the Second Trustee's Sale—in fact on the morning thereof. (*Supra* at ¶ 31). The obvious intent of the filing and timing of both the Chapter 11 Case and Involuntary Case was to prevent Lender from exercising its state law foreclosure rights. Other than the Lender exercising its rights under the Agreement to foreclose, nothing had changed with respect to the Debtor's business landscape which would have warranted commencing the Involuntary Case. *In re Delray Assocs. Ltd. Pshp.*, 212 B.R. at 515-16 (a successive involuntary bankruptcy filing was inappropriate because it was anticipated under the confirmed plan that foreclosure rights could be exercised if the debtor's plan to sell or refinance failed). The Debtor, Mr. Hard, and Henzel each knew that if the Debtor was unable to sell the Property or refinance Lender's Note, then the Lender would obtain stay relief in order to foreclose. Moreover, per the terms of the 2nd Amended Plan and Confirmation Order, this outcome was a realistic possibility. To the extent that Henzel took issue with the possibility of Lender exercising its foreclosure rights upon a failure to sell or refinance, Henzel should have objected to the Agreement being approved or to the 2nd Amended Plan being confirmed. However, Henzel did not object and sat on his rights when he had every opportunity to participate in the Debtor's Chapter 11 Case. Instead, Henzel filed this duplicitous and unnecessary Involuntary Case wasting both the Lender and Court's time with this superfluous action. To the extent, Henzel sought to stop the Second Trustee's Sale, why didn't he file a motion in the Chapter 11 Case to do so? The reason being is that he knew the Court

10

would deny any request because the Agreement had been final, the Agreement was incorporated into the terms of the 2nd Amended Plan, and Henzel had idly sat on his rights during the Chapter 11 Case. Thus, the only perceived purpose of commencing the Involuntary Case was for the Debtor, Mr. Hard, and Henzel to seek a second bite at the apple which would have the effect of buying more time for the Debtor to refinance Lender's Note or close on a sale of the Property.[9] Accordingly, the Involuntary Case was not commenced for any legitimate purpose and was intended to stop Lender's Second Trustee's Sale. *In re Winn*, 49 B.R. at 239 (dismissing a serial involuntary petition for bad faith when the sole purpose was to obtain the benefit of the automatic stay in order to frustrate a creditor in its attempts to collect a judgment).

48. Regarding the latter conclusion, the facts strongly suggest that the Involuntary Case was orchestrated by the Debtor, Mr. Hard, and Henzel in an effort to prevent Lender from foreclosing on the Property and to save whatever equity may exist in the Property. As admitted at the Deposition, the equity in the Property is part of Mr. Hard's overall retirement strategy and the Chapter 11 Case was initially filed to protect and enhance Mr. Hard's retirement. (*See supra* at ¶ 41 (xxix)-(xxx)). When the Drop-Dead Date passed and the Debtor failed to either refinance Lender's Note or sell the Property, the Debtor and Mr. Hard were at imminent risk of losing the Property and any equity therein. Furthermore, pursuant to the terms of the Agreement, both the Debtor and Mr. Hard were prevented from objecting to Lender pursuing its state law rights to recommence its foreclosure and obtain the Comfort Order. Accordingly, the Debtor and Mr. Hard were out of options.

49. However, in a last minute effort to save the Property from foreclosure, Henzel, now acting through MAPS—which happens to share: (i) the same address as Henzel; (ii) the same $1,200,000 claim amount as Henzel; and (iii) the same status of being based upon a purported "loan" as Henzel—commenced this Involuntary Case. (*See supra* at ¶¶ 38 and 39). As admitted by the Debtor, Mr. Hard and Henzel have been friends for years and were onetime business partners. (*See supra* at ¶¶ 41 (i)-(iii)). *In re Winn*, 49 B.R. at 240 (when the petitioning creditors are friends of the debtor they "were no doubt motivated to join in the involuntary petition by their desire to help the Debtor and not by their desire to pursue the Debtor in order to recover on their claims."). Furthermore, had Henzel truly been concerned about the collectability of his claim at any point prior to commencing the Involuntary Case why did he not: (i) commence the Involuntary Case prior to the Chapter 11 Case; (ii) institute any sort of collection action against the Debtor or Mr. Hard during the preceding 5-6 years his debt was incurred; (iii) perfect a security interest as authorized under the Henzel Agreement; (iv) object to the approval of the Agreement; or (v) object to the approval of the Agreement or confirmation of the 2nd Amended Plan? Instead, Henzel sat on his rights until the Debtor and Mr. Hard were out of all viable options to prevent Lender from exercising its rights. All of these facts create the impression, if not completely demonstrate, that the Involuntary Case was orchestrated by the Debtor and Mr. Hard, and that the Involuntary Case was filed in bad faith. Accordingly, "cause" exists under Section 362(d)(1) of the Bankruptcy Code, because this Involuntary Case was filed in bad faith.

---

[9] Furthermore, permitting Henzel a second bite at the apple with this Involuntary Case would encourage all aggrieved unsecured creditors in single asset real estate cases to file involuntary petitions when the secured lender forecloses on its collateral per the terms of a confirmed plan. These types of superfluous proceedings would wreak havoc on the Court's docket and further delay legitimate foreclosures in the hope that an unsecured creditor—who failed to participate in the underlying Chapter 11 case—would be able to recover on its claim.

**B.** **"Cause" Exists, Pursuant to Section 362(d)(1) of the Bankruptcy Code, Because the Terms of the Agreement Survived the Chapter 11 Case and Apply to This Involuntary Case.**

50. "Cause" also exists in this Involuntary Case because the terms of the Agreement—including relief from the automatic stay upon the occurrence of the Drop-Dead Date—were intended to expressly apply in future cases under Title 11. (*See* Chp. 11 Docket No. 98-2 at § 4(b) (stating that relief from the automatic stay under the terms of the Agreement shall be under Section 362(d)(1) of the Bankruptcy Code). Specifically, Section 13 of the Agreement, in relevant part states "[t]he terms of this Agreement *shall survive* . . . any other case pending under title 11 of the United States Code." (Chp. 11 Docket No. 98-2 at § 13). Accordingly, all terms of the Agreement were intended to be binding upon the Debtor in any other future bankruptcy case and equally apply in this Involuntary Case.[10] Moreover, despite this being a separate case, the Agreement is also binding upon Henzel/MAPS as he was a party to the Chapter 11 Case and did not object to approval of the Agreement at any point during the Chapter 11 Case. Therefore, the Court may further grant relief from the automatic stay, pursuant to Section 362(d)(1) of the Bankruptcy Code, because the terms of the Agreement apply in this Involuntary Case and are binding upon all parties hereto.

**C.** **The Court Should Further Grant Relief From the Automatic Stay Pursuant to Section 362(d)(4)(B) of the Bankruptcy Code Because the Involuntary Case was Part of a Scheme to Hinder, Delay or Defraud Lender's Exercise of its State Law Foreclosure Rights.**

51. Section 362(d)(4)(B) of the Bankruptcy Code provides:

> [W]ith respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
>
> (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4)(B).

52. Section 362(d)(4) of the Bankruptcy Code "addresses conduct that could be indicative of an abusive filing in relation to real property foreclosure." *In re API M&I Holding, LLC*, 2015 Bankr. LEXIS 139, at *18 (Bankr. D. Kan. Jan. 14, 2015). "Before a court will lift the automatic stay, it must find that (1) the debtor's bankruptcy filing was part of a scheme; (2) the scheme was intended to delay, hinder, or defraud the creditor; and (3) the scheme involved either (a) the transfer of some interest in the real property without obtaining approval from the court or

---

[10] Moreover, this Court has the inherent power to control its own docket and consolidate related proceedings in the interest of judicial economy. *See* 11 U.S.C. § 105(a) (allowing the Court to issue any order, process, or judgment necessary or appropriate to carry out the provisions of the Bankruptcy Code); Fed. R. Bankr. P. 7042 (allowing the Court to consolidate proceedings involving common questions of law or fact) and 9014(c) (incorporating Rule 7042 into contested matters). The petition in this Involuntary Case expressly acknowledges the pending Chapter 11 Case. (*See* Docket No. 2 at p. 2). Accordingly, this Court can consolidate the Involuntary Case with the Chapter 11 Case further authorizing Lender to obtain stay relief under the terms of the Agreement.

the secured creditor, or (b) multiple bankruptcy filings affecting the real property." *In re Tejal Inv., LLC*, 2012 Bankr. LEXIS 5760, at *5 (Bankr. D. Utah Dec. 12, 2012). The creditor bears the burden of proof on each element of Section 362(d)(4)(B). *Id.*

### i. The Involuntary Petition was Part of a Scheme Orchestrated by the Debtor, Mr. Hard, and Henzel.

53. Citing Black's Law Dictionary, Judge Tallman has defined the term "scheme" to mean "an artful plot or plan, usu. to deceive others <a scheme to defraud creditors>." *JPMorgan Chase Bank, N.A. v. Hutchins (In re Hutchins)*, 2016 Bankr. LEXIS 2367, at *7 (Bankr. D. Colo. June 23, 2016). The plain language of Section 362(d)(4) does not require that the Debtor be the party who "files" the petition and, accordingly, such section can equally apply to those creditors who file involuntary petitions. For all of the reasons stated above in Part V.A of the Motion, Lender submits that there is ample evidence that the filing of the Involuntary Case was done in furtherance of a scheme which was orchestrated by the Debtor, Mr. Hard and Henzel, and Lender has satisfied the first element for relief under Section 362(d)(4)(B) of the Bankruptcy Code.

### ii. The Scheme was Unequivocally Intended to Delay, Hinder, and Defraud Lender From Exercising its State Law Foreclosure Rights.

54. Following the Bankruptcy Technical Corrections Act of 2010, it is sufficient to grant relief from the automatic stay under Section 362(d)(4) when there is a "finding that a debtor has acted with *merely* the intent to delay, the intent to hinder, or the intent to defraud." *In re Tejal Inv., LLC*, at *15 (emphasis added). Accordingly, because Section 362(d)(4) is drafted in the disjunctive, the Lender need only demonstrate that the filing of the Involuntary Case had the "mere" intent to delay, hinder, or defraud Lender from exercising its foreclosure rights. The intent of filing the Involuntary Case was done with the sole purpose of stopping Lender's Second Trustee's Sale. Had Henzel/MAPS filed any type of motion in the Chapter 11 Case requesting a stay of the Second Trustee's Sale it would have been denied on the bases that the terms of the Agreement, which were incorporated into the 2nd Amended Plan, had already been approved and are binding upon all parties in the Chapter 11 Case. Furthermore, Henzel/MAPS knew that any argument to the contrary would have been meritless because—despite having actual notice of the terms of the Agreement—they sat on their rights and failed to object to approval thereof. However, by filing the Involuntary Case, Henzel/MAPS knew there was a substantial likelihood that the Adams County Public Trustee would not proceed with the Second Trustee's Sale especially when receiving the petition moments before the sale. There can be no other intent than to stop the Second Trustee's Sale—otherwise, what would be the point of commencing a whole new bankruptcy case? These concerted actions had the direct effect of both delaying, hindering, and defrauding Lender from exercising its state law foreclosure rights and satisfy the second element of Section 362(d)(4)(B) of the Bankruptcy Code.

### iii. The Scheme Involved Multiple Bankruptcy Filings Affecting the Property and Lender's Exercise of its State Law Foreclosure Rights.

55. Both the Involuntary Case and the preceding, yet currently pending, Chapter 11 Case were each filed to stop two separate foreclosure sales of the Property. The Chapter 11 Case

was filed on the eve of the First Trustee's Sale. The Involuntary Case was filed on the morning of the Second Trustee's Sale. With each sale, Lender was validly exercising its state law foreclosure rights. Accordingly, Lender has satisfied the final element of Section 362(d)(4)(B) thereby warranting relief from the automatic stay.

        **iv.    Because Lender has Carried its Burden for Relief Under Section 362(d)(4) of the Bankruptcy Code, the Order Granting This Motion Should be Binding Upon all Parties in all Other Future Bankruptcy Cases Involving the Debtor.**

56. The flush language of Section 362(d)(4) of the Bankruptcy Code allows a creditor to record a copy of a stay relief order with the appropriate recording office for real property filings and further provides that such order is "binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court . . ." 11 U.S.C. § 362(d)(4). Lender has satisfied the necessary requirements for an order to be entered under Section 362(d)(4) of the Bankruptcy Code and requests that such order be recordable and binding as provided for in the flush language.

**D.    Any Order Granting This Motion Should Waive the Stay Under Fed. R. Bankr. P. 4001(a)(3).**

57. Lender's Note matured in October of 2017 and Lender has not been paid since June of 2017. (*See* Ex. C at ¶¶ 12 and 20). Lender has twice tried to exercise its state law rights to foreclose on the Property in order to begin collecting on its debt and has been prevented each time. Lender submits that the stay provided for under Fed. R. Bankr. P. 4001(a)(3) should be waived so that Lender may expeditiously proceed to a third foreclosure sale.

WHEREFORE, Lender respectfully requests for the reasons stated above that the Court grant the Motion and enter an Order which grants its relief from the automatic stay: (i) for "cause" under Section 362(d)(1) of the Bankruptcy because this Involuntary Case was filed in bad faith; (ii) for "cause" under Section 362(d)(1) because the Agreement approved in the Chapter 11 Case is binding herein; (iii) pursuant to Section 362(d)(4) because this Involuntary Case was filed in connection with a scheme that was intended to hinder, delay, or defraud Lender in exercising its state law foreclosure rights; and (iv) for such other and further relief this Court deems fair and proper under the circumstances.

4848-7037-6582.1

**Dated:** Denver, Colorado
January 31, 2019

                      MOYE WHITE LLP

                      s/ *Timothy M. Swanson*
                      Timothy M. Swanson, #47267
                      David A. Laird, #31067
                      Moye White LLP
                      1400 16th Street, 6th Floor
                      Denver, Colorado 80202
                      Email: tim.swanson@moyewhite.com
                              david.laird@moyewhite.com
                      Phone: (303) 292-2900
                      Fax:   (303) 292-4510
                      *11380 East Smith RD Investments, LLC*

4848-7037-6582.1