UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| 11380 Smith Road, LLC | ) | Case No. 19-10286 (TBM) |
| EIN: 46-4766309 | ) | |
| | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

**RESPONSE TO 11380 SMITH ROAD INVESTMENTS, LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTIONS 362(D)(1) AND (4) OF THE BANKRUPTCY CODE**

The captioned debtor, 11380 Smith Road, LLC (the "Debtor"), by and through its counsel, Buechler & Garber, LLC, for its Response to 11380 Smith Road Investment LLC's Motion for Relief from the Automatic Stay Pursuant to Sections 362(D)(1) and (4) of the Bankruptcy Code.

**BACKGROUND**

1.      The Debtor initiated before this Court a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code on February 13, 2018 at case number 18-10965 (the "Voluntary Case").

2.      The Debtor's primary asset is its real property located at 11380 Smith Road, Aurora, Colorado, 80010 (the "Property"). In association with the Property, the Debtor also has a litigation claim with its insurance company pertain to hail damage to its roof. The repair to the roof is at least, and likely more than a million dollar issue (the "Insurance Claim").

3.      The Debtor's primary secured creditor is the movant, 11380 Smith Road Investment LLC ("Lender").

4.      Counsel for the Debtor in the Voluntary Case was Weinman & Associates, PC ("Weinman") and Brown, Dunning & Walker PC ("BDW").

5.      Pursuant to a Stipulation entered between the Debtor and the Lender in the Voluntary Case, the Debtor had until December 31, 2018 to either sell or refinance the Property (the "Stipulation," Docket No. 98).

6.      The Debtor failed to meet this deadline.

7.      The Debtor however did not cease its efforts to try to sell or refinance the Property hoping such could be completed prior to the Lender completing its foreclosure.

8.    The Debtor failed to get the Property sold or refinanced prior to the public trustee sale date

9.    The Debtor remained in contact with certain parties in interest regarding his efforts, including Weinman, BDW and Tim Henzel/Mid American Plastic Systems ("MAPS").

10.    Among the information the Debtor shared was he felt he was close to securing an offer for the purchase of the Property that would result in an ability to pay creditor claims beyond that of the claim of just the Lender – which would be the result in a foreclosure.

11.    On January 16, 2019, MAPS filed the captioned Involuntary Petition against the Debtor (the "Involuntary Case").

12.    On January 18, 2019, undersigned counsel accepted service of the Subpoena for the Involuntary Petition.

13.    On January 23, 2019, the Debtor received an offer from Hampton Partners Management Corp. ('Purchaser") to purchase the Property (the "Offer").

14.    Since such time, the Debtor and the Purchaser have been negotiating a final purchase agreement for the Property.

15.    On February 7, 2019, the Debtor and the Purchase executed the purchase agreement attached hereto as Exhibit A (the "Sale Agreement"). The pertinent terms of the Purchase Agreement are:

    a. A purchase price of $4,500,000 (para. 3.1).

    b. The Purchaser shall provide a $100,000 earnest deposit with the title company, and an additional $100,000 upon the conclusion of the inspection period (paras. 2.1, 5.3)

    c. The effective date of the Sale Agreement is upon Bankruptcy Court approval (first, unenumerated, paragraph).

    d. The is an inspection period of 30 days after the effective date of the sale agreement (para. 5.2).

    e. The closing on the sale of the Property shall occur the later of: (a) on or prior to the date that is thirty (30) days after the expiration of the inspection period; (b) to the extent required in either of the Bankruptcy Cases, three (3) business days after entry of an Order by the Bankruptcy Court approving the Sale Agreement. (para. 9.1)

    f. The Debtor shall maintain the Insurance Claim (para. 7.1).

    g. Any broker commission is being paid by the Buyer (para. 11.2).

16.     Pursuant to the Stipulation, the Lender is owed $4,439,330.80 as of January 16, 2019.  Thus, the sale price should satisfy or come close to satisfying the claim of Lender in full.

17.     In addition to the Lender, additional creditors include Weinman and BDW.  In addition, the Adam's County Treasurer's office has contacted undersigned counsel about a personal property tax obligation.   At the time of the filing of this objection, undersigned counsel was still investigating this claim,

## RESPONSE

### 11 USC § 362(d)(1)

18.     The Debtor provides the above information so that the Court can be fully informed of the current state of the Debtor's sale efforts.

19.     The Debtor cannot dispute that the Offer from the Purchaser came in after the deadline under the Stipulation.

20.     But, it is important to note, that the offer came in only 3 weeks after such deadline.

21.     The Debtor is now in a position to proceed to a closing on the sale of the Property that will allow all creditors to benefit from the sale of the Property.

22.     The Lender will be paid from the sale of the Property.   Other creditors will be paid from any proceeds received from the Insurance Claim.

23.     Such is a legitimate bankruptcy purpose.

24.     It is also worth noting that the Debtor never relented on his fiduciary duty to try to maximize a return to creditors.

25.     Lastly, under its current posture, the Lender will be paid, including accruing interest, in full or nearly in full under the sale. Thus, the Lender is adequately protected while the bankruptcy case and sale process proceeds.

### 11 USC § 362(d)(4)

26.     First, the Debtor disputes that it participated in or orchestrated the Involuntary Case. The Debtor did inform parties, including MAPS, of its sale and refinance efforts.

27.     Upon information and belief, MAPS made its own decisions as to how to best act to protect its own interests.

28.     At this point in time, the Debtor has retained new counsel to timely address the obligations with respect to the Involuntary Case filed against it.

29.     Given the Debtor is not the party that effectuated the case filing, it is not the party to speak to reasons for the filing.

30.     However, under the current posture of the case, the Debtor is proceeding with a sale and the Insurance Claim to maximize its return to creditors.

DATED February 7, 2019

Respectfully submitted,
BUECHLER & GARBER, LLC

/s/ Aaron A. Garber

Aaron A. Garber, #36099
999 18th Street, Suite 1230-S
Denver, Colorado 80202
720-381-0045 / 720-381-0382 FAX
aaron@bandglawoffice.com

EXHIBIT A

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("**Agreement**"), dated the ____ day of _____, 2019 , is by and between **11380 Smith Rd LLC**, a Colorado limited liability company ("**Seller**"), and **Hampton Partners Management Corp.**, a Colorado corporation, and/or permitted assigns ("**Purchaser**"). The "**Effective Date**" of this Agreement shall be upon approval of this Agreement by the United States Bankruptcy Court for the District of Colorado.

## RECITALS

A.     Defined terms are indicated by initial capital letters.  Defined terms shall have the meaning set forth herein, whether or not such terms are used before or after the definitions are set forth.

B.     Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller, the Property (defined below) on the terms and conditions set forth in this Agreement.

C.     Seller filed for relief under Chapter 11 of the Bankruptcy Code on February 13, 2018 in the United States Bankruptcy Court for the District of Colorado, Case No. 18-10965 (the "Voluntary Case").  A Plan of Reorganization was confirmed in the Voluntary Case on October 31, 2018.

D.     On January 16, 2019, an Involuntary Petition for bankruptcy was filed against the Seller (the "Involuntary Case").  An answer to the Involuntary Petition is due on or around February 6, 2019. The Voluntary Case and Involuntary Case are hereinafter referred to as the Bankruptcy Cases.

## AGREEMENT

## -ARTICLE I-
## PROPERTY

1.1     NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the mutual agreements contained herein, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, subject to any required Bankruptcy Court approval the following:

A.     That certain real property located at 11380 E. Smith Road, Aurora, Colorado 80010, legally described on **Exhibit A** attached hereto and incorporated herein, together with all rights-of-way, privileges, appurtenances, reservations, hereditaments, strips, minerals, water and air rights, sand, gravel, easements, including without limitation, easements for ingress, egress, parking, drainage and utilities, and all land lying between the boundaries of the land and the center line of any adjacent street, road or alley, or any portion thereof (collectively, "**Real Property**");

B.     All improvements, buildings, structures, fixtures, and amenities in connection with such improvements located on the Real Property (collectively "**Improvements**");

C.     All attached fixtures, equipment, machinery and all other personal property located on or in, or used in the operation of, the Real Property and/or Improvements (collectively "**Personal Property**");

D.     All contracts or agreements for service, repair, maintenance, supply and all other contracts relating to the operation or maintenance of the Real Property, Improvements or Personal Property, to the extent legally assignable, and to the extent Purchaser elects to assume the same pursuant

to the terms of this Agreement (collectively "**Service Contracts**"); and

E.     All signage, trade names, contract rights, warranties and guarantees directly associated with the Real Property and Improvements ("**Intangibles**").

1.2     All of the foregoing Real Property, Improvements, Personal Property, Service Contracts, and Intangibles are hereinafter collectively called the "**Property**."

## -ARTICLE II-
## EARNEST MONEY

2.1 Earnest Money Deposit.   Within three (3) days after the Effective Date, Purchaser shall deposit earnest money in the amount of $100,000.00 in good funds (together with all accrued interest thereon, and any Additional Deposit (ad defined herein), collectively,  the "**Earnest Money**"), which shall be held by Land Title Guarantee Company ("**Title Company**"), attention Tom Blake, Ph: 303-331-6237, Email: tblake@ltgc.com, as provided herein, in an interest-bearing account with a federally insured lending institution.  The Earnest Money shall become nonrefundable to Purchaser only as provided in this Agreement. In the event Purchaser fails to timely deposit the Earnest Money, then Seller's sole and exclusive remedy therefor shall be to be terminate this Agreement in writing to Purchaser after first providing Purchaser with written notice of such failure and two (2) days after Purchaser's receipt (or deemed receipt pursuant to the notice provisions herein) of such notice to cure.

## -ARTICLE III-
## PURCHASE PRICE

3.1     Purchase Price.   The purchase price for the Property shall be $4,500,000 ("**Purchase Price**").  The Purchase Price shall be paid to Seller by Purchaser at Closing as follows: (a) the Earnest Money as a credit toward the Purchase Price; and (b) the balance of the Purchase Price, adjusted for prorations as provided herein, shall be paid at Closing by Purchaser to the Seller in good funds delivered through the Title Company.

## -ARTICLE IV-
## TITLE

4.1     Title Commitment, Survey and Review.

A.     Title Commitment.   On or before five (5) business days from the Effective Date, Seller will cause the Title Company to deliver to Purchaser a title commitment ("**Title Commitment**") to issue to Purchaser an A.L.T.A. Owner's Policy of title insurance (the "**Title Policy**") which will (i) be in the amount of the Purchase Price, (ii) insure that fee simple title to the Property is vested in Purchaser; and (iii) exclude the standard, preprinted exceptions, except for the real property tax and assessment exception, which shall be modified to except only for real property taxes and assessments for the year of Closing and subsequent years, a lien not yet due and payable.  In addition to the Title Commitment, Seller will cause the Title Company to deliver to Purchaser copies of all documents identified as exceptions in the Title Commitment and a tax certificate applicable to the Real Property (collectively, the "**Title Documents**").

B.     Survey.   Seller has provided Purchaser an ALTA survey of the Property dated August 15, 2016 (the "**Survey**"). The Survey will contain the ALTA table items reasonably selected by Purchaser and its lender (if any), and will be certified to Purchaser, Purchaser's permitted assigns, Purchaser's lender (if any) and the Title Company. Any update necessary for Purchase and its lender (if

any) will be at Purchaser's expense.

C.    Title Review and Permitted Exceptions.    Purchaser may review the Title Commitment, the Title Documents, and the Survey as part of its investigations hereunder and will have the right to negotiate directly with the Title Company in order to cause the Title Company to modify the Title Commitment to reflect only those exceptions to title that are acceptable to Purchaser, subject to Seller's obligations hereunder.  Notwithstanding the foregoing or any other term or provision herein to the contrary, Seller will cause any and all monetary liens and encumbrances that currently affect the Property, or any portion thereof, or that could later affect the Purchaser or the Property, or any portion thereof, related in any way to Seller's ownership of the Property or that arose or accrued at any time prior to Closing, to be extinguished and fully released prior to Closing, except only the lien for real property taxes and assessments that are not yet due and payable.  The term **"Permitted Exceptions"** as used in this Agreement shall be deemed to mean (i) any matters shown in the Title Commitment that are approved by Purchaser pursuant to the terms hereof; and (ii) any and all recorded documents evidencing and/or securing any acquisition financing obtained by Purchaser.

4.2    Issuance of Title Policy.  Within a reasonable time following Closing, Seller will cause the Title Company to deliver to Purchaser the Title Policy subject only to the Permitted Exceptions. Except as expressly set forth herein, Purchaser and Seller shall execute reasonable documents required by Title Company in order to issue such policy.

## -ARTICLE V-
## INSPECTION & FINANCING

5.1    Delivery of Evaluation Materials.  Within five (5) business days after the Effective Date Seller shall deliver to Purchaser copies of the following items or information that are in Seller's possession or control (collectively, the **"Evaluation Materials"**): All documents, records or other information relating to the Property and its operations that are necessary for Purchaser to perform the Due Diligence (defined below), including, without limitation the following:

(i)     Site plans;
(ii)    Building plans;
(iii)   Environmental reports;
(iv)    Soil reports;
(v)     ADA reports;
(vi)    Plans and specifications for the Improvements;
(vii)   Construction and building permits;
(viii)  Development agreements;
(ix)    Utility permits;
(x)     Service and maintenance contracts; and
(xi)    Insurance policies
(xii)   All documentation and correspondence regarding current roof claim and pending settlement

In addition to the foregoing, Seller will promptly furnish to Purchaser any other documents or information reasonably requested by Purchaser.

5.2    Inspection Period.  From the Effective Date until 5:00 pm, local time at the Property on the date that is thirty (30) days following the Effective Date (the **"Inspection Period"**), Purchaser shall have access to the Property to examine, inspect and investigate the Property and the Evaluation Materials and to review any and all matters affecting or relating to the Property or this transaction (such actions by

Purchaser are collectively referred to herein as **"Due Diligence"**), to determine the feasibility of this transaction and the suitability of the Property for Purchaser's purposes. During its Due Diligence, Purchaser must give Seller at least twenty-four (24) hours' notice prior to performing any intrusive inspection or test *(e.g.,* core sampling). Purchaser agrees to indemnify and hold Seller harmless from any and all damages or injury to Seller or the Property caused by Purchaser or its agents or contractors in performing its Due Diligence.

     5.3    <u>Termination.</u>  Purchaser shall have until the expiration of the Inspection Period to elect, in its sole and unfettered discretion, in writing to Seller, to either (a) purchase the Property; or (b) terminate this Agreement (**"Inspection Termination Notice"**). In the event Purchaser timely delivers the Inspection Termination Notice, this Agreement shall terminate, both parties will be relieved of any further obligations hereunder, except for those obligations which expressly survive any termination hereof, and the Earnest Money shall be returned to Purchaser. In the event Purchaser fails to timely deliver the Inspection Termination Notice, Purchaser shall be deemed to have elected not to terminate pursuant to (a) above, in which case this Agreement shall remain in full force and effect and, within five (5) days of the expiration of the Inspection Period, Purchaser shall tender an additional Earnest Money deposit of $100,000.00 to the Title Company (**"Additional Deposit"**).

-ARTICLE VI-<br>REPRESENTATIONS

     6.1    <u>Seller's Representations and Warranties.</u>  Seller represents and warrants to Purchaser as of the Effective Date and again as of the Closing Date, as follows:

     A.    <u>Authority.</u>  Seller is duly organized, validly existing and in good standing as a limited liability company under the laws of Colorado, authorized to transact business in the State of Colorado, and has full power and authority to enter into and consummate the terms of this Agreement, subject to any required Bankruptcy Court approval;

     B.    <u>Litigation.</u>  There is no litigation, suit, action, proceeding or investigation, arbitration proceeding or eminent domain proceeding, pending, or, to the best of Seller's knowledge, threatened, at law or in equity, before any federal or state court or any governmental department, commission, board, bureau or instrumentality against the Seller or the Property, or any portion thereof or the operation or management thereof by Seller except for: (i) the Bankruptcy Cases, and (ii) the public trustee sale of the Real Property in Adams county that is stayed as a result of the Involuntary Case; and (iii) the Insurance Claim;

     C.    <u>Leases</u>. There are no leases or tenancy rights that exist with respect to the Property;

     D.    <u>No Blocked Party</u>. Seller is currently in compliance with and shall at all times prior to Closing remain in compliance with the regulations of the Office of Foreign Assets Control ("OFAC") (including those named in OFAC's Specially Designated and Blocked Persons list) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities;

     E.    <u>Service Contracts</u>. The Service Contracts, if any, are in full force and effect and neither Seller nor, to the best of Seller's knowledge, any other party, is in default in any material respect under any of the Service Contracts; The Seller represents that there are no Service Contracts.

F.    <u>No Preemptive Rights.</u>  The Seller has not granted any option or right of first refusal or first opportunity to any party to acquire or lease any interest in any of the Property; and

G.    <u>Hazardous Materials.</u>  Except as may be disclosed to Purchaser in any environmental reports delivered by Seller to Purchaser as part of the Evaluation Materials, no hazardous material or contamination (as those terms are used or defined in any applicable state or federal law) is contained within or located at or under the Property.

H.    <u>Survival.</u>  Seller's foregoing representations and warranties will survive Closing for a period of two (2) years.

6.2    <u>Nature of Conveyance.</u>  Except for the foregoing express representations and warranties, and any warranties of Seller in the Deed, Bill of Sale, or other closing documents, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE CONCERNING THE PROPERTY. INSTEAD, THE PROPERTY WILL BE CONVEYED IN ITS "AS-IS" CONDITION, AND WITH ALL FAULTS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER DISCLAIMS ALL WARRANTIES CONCERNING THE MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, CONDITION, SIZE, VALUE, SUITABILITY, LEGAL ENTITLEMENT STATUS, AND BOUNDARY LOCATIONS OF THE PROPERTY.

6.3    <u>Purchaser's Representations and Warranties.</u>    Purchaser represents and warrants to Seller, as of the Effective Date and again as of the Closing Date, as follows:

A.    <u>Organization and Standing.</u>  Purchaser is duly organized, validly existing and in good standing as a corporation under the laws of Colorado, authorized to transact business in the State of Colorado, and has full power and authority to enter into and consummate the terms of this Agreement.

B.    <u>Litigation.</u>  There are no actions, suits, proceedings or investigations, arbitration proceedings or eminent domain proceedings pending or, to the best of Purchaser's knowledge, threatened, at law or in equity, before any federal or state court or any governmental department, commission, board, bureau or instrumentality against Purchaser which would prevent Purchaser from consummating the transaction contemplated herein.

C.    <u>No Blocked Party.</u>  Purchaser is currently in compliance with and shall at all times prior to Closing remain in compliance with the regulations of OFAC (including those named in OFAC's Specially Designated and Blocked Persons list) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action regarding transactions with persons who commit, threaten to commit, or support terrorism and is not and will not knowingly engage in any dealings or transactions or be otherwise associated with such persons or entities.

-ARTICLE VII-
COVENANTS

7.1    <u>Covenants.</u>

A.    <u>Property Improvements.</u>  Except as otherwise expressly provided herein with regards to the items described in Sections 7.1A(i) and (ii), on or prior to the expiration of the Inspection Period, Seller shall, at Seller's cost and expense:

(i) ~~Replace the HVAC units servicing the Property with new HVAC units*;~~

(ii) ~~Fully replace the roof*;~~

(iii)    Remove all debris, loose construction material, equipment and any other items not attached to floor or walls and broom clean the following areas: Front main office area; mezzanine office area, shop/maintenance room; and warehouse/shop area;

(iv)    Remove all debris, loose construction material, equipment, pallets and any other items present, and broom clean the alley located on the west side of the Property;

(v)    Remove plastic sheeting and wood slats from sides of awning structure and remove all equipment and debris within the area of the south side awning and sheltered area; and

(vi)    Remove all debris, material, equipment, pallets, chemicals, cleaners, paint, fuels, and byproducts, together with everything inclusive in general cleanup of the Property.

(vii)    Remove recently installed interior walls completely together with all associated material and debris.

* Purchaser and Seller acknowledges and agrees that an insurance claim and/or related litigation is currently pending with regards to the roof and associated HVAC rooftop units serving Property (the "Insurance Claim"). ~~items described in Sections 7.1A(i) and (ii). Purchaser's obligation to close on the Property is contingent upon Purchaser's approval of any insurance claim settlement, which shall include, without limitation, sufficient funds for the completion of items described in Sections 7.1A(i) and (ii).~~ Seller and Buyer acknowledge that the Purchase Price takes into consideration the issues with the roof. The Buyer shall have not right to or interest in the Insurance Claim.

B.    Maintenance of Property.    Other than the foregoing Property Improvements, Seller shall continue to maintain and otherwise operate the Property through the Closing Date in substantially the same manner as the same has been operated by Seller prior to the Effective Date.

C.    Leases.    Seller covenants and agrees that from the Effective Date until the Closing (or the earlier termination of this Agreement), Seller will not enter into any leases or occupancy agreements without the prior, written consent of Purchaser, in Purchaser's sole discretion.

-ARTICLE VIII-
DAMAGE, DESTRUCTION OR CONDEMNATION

8.1    Condemnation.    If prior to Closing, Seller receives knowledge that all or any portion of the Real Property is to be taken under any power of eminent domain or similar action, Seller shall promptly notify Purchaser and Purchaser shall have fifteen (15) days after its receipt of such notice, by written notice to Seller, to elect to either (a) take title to the Real Property at Closing, in which event Seller shall execute and deliver an assignment of all of its rights in and to the condemnation award to Purchaser (and/or Purchaser shall receive the condemnation award from Seller to the extent Seller already has been paid any portion thereof prior to Closing); or (b) cancel this Agreement, and, in that event, this Agreement shall be terminated, and the Earnest Money shall be returned to Purchaser, and neither party thereafter shall have any obligation to or right or remedy against the other, except for such obligations as expressly survive termination.

8.2    Damage by Casualty.    It is the intention of the parties that the risk of loss from damage or casualty related to the Property shall be Seller's prior to Closing. Seller shall promptly notify Purchaser of any damage in excess of $10,000.00 which shall occur and of Seller's best estimate, based upon a report of an independent engineer, of the cost to repair any such damage. If the Property or any portion

thereof is damaged by fire or other casualty prior to Closing such that the reasonable cost of repair and restoration of such damage with materials of like kind and quality is at or greater than $30,000.00, Purchaser may elect to terminate this Agreement and, in such event, the Earnest Money shall be returned to Purchaser, and thereafter neither party shall have any obligation to or right or remedy against the other, except for obligations that expressly survive termination. If the cost of repair and restoration is less than $30,000.00 or, if such cost is more than $30,000.00 and Purchaser elects to close the sale, Seller shall at Closing, pay to Purchaser the insurance proceeds received related to such damage under such insurance policies and assign to Purchaser all of Seller's right, title and interest in and to the proceeds of any and all fire or other casualty insurance relating to such damage, less any sums expended or incurred by Seller for repair or restoration of damage prior to Closing. Seller shall not be entitled to any reimbursement from Purchaser for any deductibles or co-pays that are payable under Seller's insurance policies.

## -ARTICLE IX-
## CLOSING

9.1     Closing Time and Place. The closing of Purchaser's acquisition of the Property shall occur the later of: (a) on or prior to the date that is thirty (30) days after the expiration of the Inspection Period; (b) to the extent required in either of the Bankruptcy Cases, three (3) business days after entry of an Order by the Bankruptcy Court approving this Agreement ("**Closing**" or "**Closing Date**"). Purchaser may elect to close prior to such date upon providing reasonable notice to Seller and provided any requisite Bankruptcy Court approval has been obtained. The Closing shall take place on such date at the offices of the Title Company or at such other time and place as the parties may mutually agree.

9.2     Closing. The following shall occur at Closing, each requirement being an obligation of the respective party and a condition precedent to the others and all being considered as occurring simultaneously:

A.     Deed. Seller shall execute, have acknowledged and deliver to Purchaser a general warranty deed (the "**Deed**") substantially in the form of **Exhibit B**, attached hereto and incorporated herein, conveying fee title to the Real Property to Purchaser subject only to the Permitted Exceptions;

B.     Bill of Sale, Assignment and Assumption. Seller and Purchaser shall execute and deliver to each other a bill of sale, assignment and assumption (the "**Bill of Sale**"), substantially in the form of **Exhibit C** attached hereto and incorporated herein, wherein the Seller shall (i) convey to Purchaser the Personal Property; and (ii) assign to Purchaser and Purchaser shall assume from Seller, the Intangibles and the Service Contracts, if any, that Purchaser elects to assume by providing notice of such election to Seller prior to the expiration of the Inspection Period; and (iii) Seller's rights in and to the Insurance Claim, if applicable . Seller shall, at Seller's sole cost and expense, on or prior to the Closing Date, terminate any Service Contracts that Purchaser does not elect to assume, such that the effective date of such terminations will be on or prior to the Closing Date;

C.     FIRPTA. Seller shall execute, have acknowledged, and deliver to Purchaser a non-foreign affidavit to assure Seller's compliance with Section 1445 of the Internal Revenue Code of 1986, as amended;

D.     Original Service Contracts and Other Items. Seller shall deliver to Purchaser all originals of any assumed Service Contracts and any and all keys, fobs, remotes, and codes to the Property;

E.     Rent Roll. Seller shall cause to be delivered to Purchaser an up-to-date Rent Roll certified to be true and accurate as of the date of Closing.

F.    Possession.  Purchaser shall be entitled to possession of the Property immediately upon Closing; and

G.    Other Documents.  Purchaser and Seller shall execute and deliver such other documents as may be reasonably required by the Title Company in order to consummate the transaction as set forth in this Agreement.

9.3    Costs and Credits.  This transaction shall be subject to the following allocation of costs and credits:

A.    Seller Costs.  Seller shall pay for (i) the costs of preparation of the Title Commitment and the base premium with extended coverage for the Title Policy, (ii) one half of the escrow and closing charges assessed by the Title Company, (iii) the tax certificate, (iv) the Survey, and (v) all use, sales, transfer, recording, filing, excise, documentary, revenue stamp and similar fees and taxes payable in connection with the transfer of the Property contemplated by this Agreement; and

B.    Purchaser Costs.  Purchaser shall pay for (i) the cost of any additional endorsements or coverage to the Title Policy that are not the obligation of Seller, and any lender's title insurance policy and endorsements thereto; (ii) all fees, recording costs or taxes due in connection with any financing obtained by Purchaser; and (iii) one half of all other escrow and closing charges assessed by the Title Company.

9.4    Prorations.  Except as specifically set forth below, the following shall be prorated between Seller and Purchaser as of 12:00:01 a.m. of the day of Closing ("**Adjustment Point**"):

A.    Service Contracts.  Costs and fees associated with the assumed Service Contracts shall be prorated based on an average of the three most recent billing statements for such Service Contracts.  Such proration shall be considered final, unless either Purchaser or Seller, on or prior to sixty (60) days after the Closing Date, elect, by written notice to the other party, to have a final proration of such costs and fees performed based on actual amounts billed for the month of Closing;

B.    Utilities.  Seller shall attempt to obtain a final reading of all utilities which are the responsibility of the Seller as owner of the Property prior to Closing and arrange to pay the final billings directly to the appropriate utility companies.  Purchaser shall attempt to arrange for all such utility billing as of the date of Closing to be billed to and paid directly by Purchaser.  Further, Seller shall receive from the appropriate utility companies any and all deposits and bonds made by Seller with respect to such utilities.  To the extent transfer of billings is not possible as of the date of Closing, the cost of such utilities shall be estimated and apportioned between the parties on the basis of the latest actual bill for such services as of the Adjustment Point.  This estimate shall be considered a final settlement as of Closing unless either Purchaser or Seller, on or prior to sixty (60) days after the Closing Date, elect, by written notice to the other party, to have a final proration of such costs and fees performed based on actual amounts billed for the month of Closing;

C.    Real Property Taxes.  Real property taxes for the year of Closing, shall be prorated to the Adjustment Point.  If the date of Closing shall occur before the real property tax rate or assessed valuation for the then-current tax year is fixed, real property taxes shall be prorated on the basis of the most recently available assessment and the most recently available mill levy.  This proration shall be considered a final settlement as of Closing;

D.    Other Costs.  Except as otherwise set forth in this Agreement, each party shall

pay all other costs and expenses, including attorney's fees, incurred by such party in connection with the transactions contemplated by this Agreement; and

     E.    Corrections.  Any errors or omissions in computing adjustments at the Closing shall be promptly corrected, provided that the party seeking to correct such error or omission shall have notified the other party of such error or omission (or, if the parties cannot agree, shall have commenced any legal action) on or prior to the date that is ninety (90) days following the Closing Date.

## -ARTICLE X-
## DEFAULTS AND REMEDIES

     10.1    Default by Seller.  In the event Seller defaults under this Agreement, then Purchaser will be entitled to (a) terminate this Agreement, in which case the Earnest Money will be returned to Purchaser, or (b) treat this Agreement as being in full force and effect (specific performance), and/or (c) pursue any and all other remedies available at law or in equity.

     10.2    Default by Purchaser.  In the event Purchaser defaults under this Agreement, Seller may, as Seller's sole and exclusive remedy therefor, terminate this Agreement and retain so much of the Earnest Money as has been deposited at the time as liquidated damages, and, thereafter, neither party shall have any further obligations to the other.  The parties have agreed that Seller's actual damages, in the event of a default by Purchaser, would be extremely difficult or impractical to determine.  The parties acknowledge the Earnest Money has been agreed upon, after negotiation, as the parties' reasonable estimate of Seller's damages.

## -ARTICLE XI-
## MISCELLANEOUS

     11.1    Notices.  Any notices under this Agreement shall be in writing, signed by the party giving the same and shall be deemed properly given and received when (i) personally delivered, or (ii) three (3) business days after mailed, if sent by registered or certified United States mail, postage prepaid, or (iii) on the same day if sent by email, or (iv) two (2) business days after receipted deposit with a reputable overnight delivery service designated for delivery on the next succeeding business day with proof of delivery, addressed to the party to receive the notice at the address set forth below or such other address as any party may specify by notice to the other party.

If to Seller, to:       11380 Smith Rd LLC
Attn: Louis Hard
11380 E. Smith Rd
Aurora, CO 80010
Email: louishard@comcast.net

With a copy to:      Aaron Garber
Buechler & Garber, LLC
999 18th Street, Suite 1230S
Denver, CO 80202
e-mail: aaron@bandglawoffice.com

If to Purchaser, to:    Hampton Partners Management Corp.
Attn: Jeffrey Robinson

201 Fillmore St., Ste 201
Denver, CO 80206
Email: jeff@hamptonpartners.net

With a copy to:    Mills Schmitz Halstead Zaloudek LLC
Attn: Amanda Halstead, Esq.
600 17th St., Ste 2800
Denver, CO 80202
Email: AHH@mshzlaw.com

    11.2   <u>Brokers</u>. Purchaser shall pay Matt Capecelatro of Citywide Commercial Properties, LLC, and Rob Lockhart of Ringsby Realty Corporation a real estate commission pursuant to the terms and provisions of a separate written agreement. Other than as set forth in this Section, no other party will be entitled to a fee, commission or compensation in connection with the transaction contemplated by this Agreement. Each party agrees to indemnify, defend and hold harmless the other party and all shareholders, employees, officers and directors of the other party or the other party's parent or affiliate (each of the above is individually referred to as an "**Indemnitee**") from all claims, including attorney's fees and costs incurred by an Indemnitee as a result of anyone's claiming by or through the other party any fee, commission or compensation on account of this Agreement, its negotiation or the sale hereby contemplated. This Section shall survive Closing.

    11.3   <u>Status of Parties</u>. The parties acknowledge their status is one of seller and purchaser of real estate, and nothing contained herein constitutes Seller as an agent or partner of Purchaser, or vice versa.

    11.4   <u>Assignable</u>. Purchaser may, in Purchaser's sole discretion, assign this Agreement to any partnership, limited liability company, or any other form of entity that is wholly or partially owned and/or controlled by Purchaser or any one or more of Purchaser's members. Except for the foregoing, Purchaser may not assign this Agreement without the Seller's prior, written consent, which Seller will not unreasonably withhold.

    11.5   <u>Recording</u>. Neither party shall record this Agreement nor any memorandum hereof. In the event of such recording, the recorded document shall automatically be deemed void.

    11.6   <u>Severability</u>. If any clause or provision of this Agreement is illegal, invalid or unenforceable under applicable present or future laws, it is the intention of the parties that the remainder of this Agreement shall not be affected, and in lieu of any such clause or provision, there be added as a part hereof a substitute clause or provision as similar in terms and effect to such illegal, invalid or unenforceable clause or provision as may be possible.

    11.7   <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

    11.8   <u>Costs of Legal Proceedings</u>. If either party institutes legal proceedings with respect to this Agreement, the prevailing party shall be entitled to court costs and reasonable attorneys' fees incurred by such party in connection with such legal proceedings.

    11.9   <u>No Oral Modifications</u>. No amendments or modifications to this Agreement shall be made or deemed to have been made unless in writing executed and delivered by the party to be bound thereby.

11.10    _Time of the Essence_.  Except as specifically provided herein, all of the provisions of this Agreement regarding time for performance are of the essence.  In the event any date specified in this Agreement falls on a weekend or holiday observed by a lending institution in the city where the Property is located, the applicable date, including Closing shall be the next date thereafter that is not a weekend or holiday.

11.11    _Governing Law_.  This Agreement shall be interpreted and enforced according to the laws of the State of Colorado.

11.12    _Headings and Captions_.  The headings and captions contained in this Agreement are for convenience only and shall not be considered in interpreting the provisions hereof.

11.13    _Counterparts_.  This Agreement, including electronic, facsimile and emailed copies of this Agreement, may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

11.14    _Incorporation_.  The above Recitals are hereby incorporated herein as if fully set forth in this Agreement.

11.15    _Drafting_.  The parties hereto have participated in the drafting and negotiation of this Agreement, and it is agreed that any claim as to ambiguity shall not be construed for or against either party as a result of such drafting.

11.16    _1031 Exchange_.  Purchaser may consummate the purchase of the Property as part of a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code, as amended.  If Purchaser requests, the Seller agrees to reasonably cooperate with the Purchaser with respect to such exchange, provided: (i) there shall be no delay in the Closing Date; (ii) the Purchaser shall not be released from its obligations under this Agreement if the exchange fails to occur for any reason and the Purchaser shall remain obligated to purchase or sell the Property; (iii) the Seller does not assume any additional liabilities or obligations or any personal liability as a result of the exchange or attempted exchange; and (iv) the Seller will not be obligated to take title to any other property pursuant to any such exchange.  The terms and provisions of this Section shall survive Closing.

11.17    _Marketing_.  Seller may continue to market the Property for sale or refinance of the Real Property the earlier of i) the Closing; or (ii) Bankruptcy Court approval of this Agreement.

11.18    _Bankruptcy Court Approval_.  To the extent required in either of the Bankruptcy Cases, counsel shall within five business days of execution of this Agreement by all parties seek Bankruptcy Court approval of this Agreement pursuant to 11 U.S.C. § 363(f) free and clear of all liens, claims and encumbrances. This Agreement is subject to higher and better offers until such time as the Bankruptcy Court enters an order approving this Agreement (the Effective Date) and thereafter shall become a binding agreement.  In the event that such approval is not received within forty (40) days of the date hereof, this Agreement shall be void and of no force or effect.

11.19    _Foreclosure_.  In the event that the Property is foreclosed upon prior to the Closing, this Agreement shall terminate and the Earnest Money shall be promptly refunded to Purchaser.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**PURCHASER:**

**Hampton Partners Management Corp.**, a Colorado corporation

By: _____

Name: _Jeffrey Robinson_____

Title: _Managing Partner_____

**SELLER:**

**11380 Smith Rd LLC**, a Colorado limited liability company

By: _____

Name: _LOUIS, HARD_____

Title: _Managing partner_____

**[END OF SIGNATURES]**

**Exhibit A**
**To Purchase Agreement**
**(Legal Description)**

SUB:MORRIS HEIGHTS FILING NO 2 AMENDED BLK:18 DESC: BEG AT NW COR BLK 18 TH S ALG W LN SD BLK 584/69 FT TH ELY ON ANG TO LEFT OF 90D 471/235 FT TH NLY ON ANG TO LEFT OF 90D 536/545 FT TO NLY LN SD BLK TH NWLY ON ANG TO LEFT OF 84D 10M 473/69 FT TO POB EXC E 30 FT AND EXC PART TO RTD FOR FASTRACKS (REC NO 2012000081138)

County of Adams
State of Colorado

Commonly known as: 11380 E. Smith Road, Aurora, Colorado 80010.

**Exhibit B**
**To Purchase Agreement**
**(Form of General Warranty Deed)**

AFTER RECORDING MAIL TO:

Hampton Partners Management Corp.
Attn: Jeffrey Robinson
201 Fillmore St., Ste 201
Denver, CO 80206

### GENERAL WARRANTY DEED

**THIS DEED,** dated _____, 2019, between **11380 Smith Rd LLC**, a Colorado limited liability company (**"Grantor"**), and _____ (**"Grantee"**), whose legal address is _____:

**WITNESS,** that the Grantor, for and in consideration of the sum of **Ten and no/100 Dollars ($10.00)**, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm unto the Grantee, its successors and assigns forever, all the real property, together with improvements, if any, situate, lying and being in the County of Adams and State of Colorado, described in **Exhibit A**, attached hereto (the **"Property"**).

**TOGETHER** with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the Grantor, either in law or equity, of, in and to the Property, with the hereditaments and appurtenances, subject only to the matters set forth in **Exhibit B**, attached hereto and made a part hereof for all purposes;

**TO HAVE AND TO HOLD** the said Property, with the appurtenances, unto the Grantee, its successors and assigns forever. The Grantor, for itself, its successors and assigns, does covenant and agree that it shall and will WARRANT AND FOREVER DEFEND the Property in the quiet and peaceable possession of the Grantee, its successors and assigns, against all and every person or persons lawfully claiming the whole or any part thereof.

The singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

**[SIGNATURE ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** the Grantor has caused its name to be hereunto subscribed the day and year first above written.

<u>**GRANTOR**</u>:

**11380 Smith Rd LLC,** a Colorado limited liability company

By: _____

Name: _____

Title: _____


STATE OF _____)

                              ) ss.

COUNTY OF _____)

     The foregoing instrument was acknowledged before me this _____ day of _____, 2019, by _____ as _____ of 11380 Smith Rd LLC, a Colorado limited liability company.

     Witness my hand and official seal.


     My commission expires:_____.


_____
Notary Public

**[END OF SIGNATURES]**

**Exhibit A**
**To General Warranty Deed**
**(Legal Description)**

*[NOTE: The following legal description will be updated in the final version at Closing to match the legal description contained in the Title Commitment]*

SUB:MORRIS HEIGHTS FILING NO 2 AMENDED BLK:18 DESC: BEG AT NW COR BLK 18 TH S ALG W LN SD BLK 584/69 FT TH ELY ON ANG TO LEFT OF 90D 471/235 FT TH NLY ON ANG TO LEFT OF 90D 536/545 FT TO NLY LN SD BLK TH NWLY ON ANG TO LEFT OF 84D 10M 473/69 FT TO POB EXC E 30 FT AND EXC PART TO RTD FOR FASTRACKS (REC NO 2012000081138)

County of Adams
State of Colorado

Commonly known as: 11380 E. Smith Road, Aurora, Colorado 80010.

**Exhibit B**
**To General Warranty Deed**
(Permitted Exceptions)

*[To be completed in the final version at Closing listing the Permitted Exceptions accepted by Purchaser pursuant to the Agreement.]*

Exhibit C
To Purchase Agreement
(Bill of Sale)

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION (this "**Bill of Sale**") is made as of the _____ day of _____, 2019, by and between **11380 Smith Rd LLC**, a Colorado limited liability company ("**Assignor**"), and _____ ("**Assignee**").

W I T N E S S E T H:

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged Assignor and Assignee hereby agree as follows:

1.    Assignor hereby sells, transfers, assigns and conveys to Assignee the following, free and clear of all liens and encumbrances of any kind:

A.    The tangible personal property ("**Personalty**") set forth in the inventory on **Schedule 1** attached hereto and made a part hereof and located in or on or used in connection with that certain land and improvements commonly known as 11380 E. Smith Road, Aurora, Colorado 80010 (the "**Real Property**");

B.    The contracts set forth on **Schedule 2** attached hereto and made a part hereof (the "**Service Contracts**").

C.    All intangible personal property related to the Real Property (the "**Intangible Personal Property**");

D.    Any and all rights in and to Claim No. _____, filed with _____ and relating to the roof of the Property.

TO HAVE AND TO HOLD the foregoing described property unto Assignee, its successors and assigns forever.

2.    Assignor represents and warrants to Assignee that, other than the Service Contracts, there are no other contracts, agreements, tenancies or third-party rights, that affect the Real Property or that could be binding on Assignee after the date hereof.

3.    Assignee hereby accepts the assignment of the Service Contracts and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations thereunder arising from and after the date hereof. Assignor indemnifies, defends and holds harmless Assignee from and against any and all claims, causes of action, demands, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) related to (a) Assignor's ownership of or obligations under the Personalty, Service Contracts, and Intangible Personal Property, and (b) Assignor's representations and warranties set forth in Paragraph 2 above. Assignee indemnifies, defends and holds harmless Assignor from and against any and all claims, causes of action, demands, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) related to Assignee's ownership of or obligations under the Personalty, Service Contracts, and Intangible Personal

Property from and after the date hereof, to the extent the same were assigned, conveyed and/or credited to Assignee by Assignor.

4.      If either party commences any suit, action or demand against the other for any breach of this Bill of Sale, the prevailing party shall be entitled to recover from the other party such costs and reasonable attorneys' fees as the prevailing party may have incurred in connection therewith.

5.      This Bill of Sale shall be interpreted and enforced according to the laws of the State of Colorado.

6.      This Bill of Sale may be executed in any number of counterparts, each of which, including electronic, facsimile and emailed copies, shall be deemed an original, but all of which shall constitute one and the same instrument.

7.      This Bill of Sale shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale as of the date first above written.

*[signatures and exhibits to be attached to final version at Closing]*

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 7, 2019 I served by ECF a copy of the **RESPONSE TO 11380 SMITH ROAD INVESTMENTS, LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTIONS 362(D)(1) AND (4) OF THE BANKRUPTCY CODE** on all parties against whom relief is sought and those otherwise entitled to service pursuant to FED.R.BANKR.P. and these L.B.R. at the following addresses:

| | |
|---|---|
| Duncan E. Barber<br>7979 E. Tufts Avenue<br>Ste. 1600<br>Denver, CO 80237-3358 | Robert Samuel Boughner<br>US Trustee<br>Byron G. Rogers Federal Building<br>1961 Stout St. Ste. 12-200<br>Denver, CO 80294-6004 |
| Timothy M. Swanson<br>1400 16th St.<br>6th Floor Bypassed<br>Denver, CO 80202 | |

By: */s/ Nichole Garber*
For Buechler & Garber, LLC